JUDGE CHIN

~~~~~~~~~ (~~~95)
Manny J. Caixeiro (MC 0218)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154
212-407-4000

08 CV 5859

*Attorneys for Respondent Paramount Farms, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X

In the Matter of the Application of           :

VENTILEX B.V.,                                :

FOR AN ORDER PURSUANT TO ARTICLE  :
75 OF THE CPLR STAYING
ARBITRATION,                                  :

                      Petitioner,          :

      -against-                                :

PARAMOUNT FARMS, INC.,

          Respondent.

----------------------------------------------------------- X

Case No.:

**NOTICE OF REMOVAL OF ACTION
UNDER 28 U.S.C. § 1441**

RECEIVED
JUN 30 2008
U.S.D.C. S.D. N.Y.
CASHIERS

TO THE CLERK OF THE COURT:

    PLEASE TAKE NOTICE that respondent Paramount Farms, Inc. ("Paramount Farms") hereby removes to this Court the action described below:

    1.    On or about June 24, 2008, a civil action was commenced in the Supreme Court of the State of New York entitled <u>Ventilex B.V. v. Paramount Farms. Inc.</u>, New York County Index No. 108818/2008 (the "State Court Action").

    2.    On or about June 25, 2008, in connection with the State Court Action, counsel for Ventilex B.V. delivered to in-house counsel for Paramount Farms (via electronic

mail and facsimile) an unsigned copy of a proposed *Order to Show Cause for Stay of Arbitration and Temporary Restraining Order*, and copies of a *Memorandum of Law in Support of Ventilex B.V.'s Petition for an Order Staying Arbitration and Temporary Restraining Order*, a *Verified Petition* (with exhibits), and an *Affirmation of Donald H. Chase in Support of Petition to Stay Arbitration* (with exhibits) (collectively, the "Petition and proposed Order"). A true and correct copy of the Petition and proposed Orders, as served upon Paramount Farms via electronic mail, is annexed hereto as Exhibit 1.[1]

3. In the Petition and proposed Orders, Ventilex B.V. purports to request a stay of an arbitration commenced by Paramount Farms against Ventilex B.V. and its subsidiary Ventilex USA, Inc. before the American Arbitration Association (the "arbitration") on the ground that Ventilex B.V. allegedly is not party to any arbitration agreement with Paramount Farms.

4. In the arbitration, Paramount Farms has claimed, *inter alia*, that Ventilex B.V. and Ventilex USA, Inc. are in breach of a contract with Paramount Farms, and have caused Paramount Farms in excess of $5 million in compensatory damages. (*See* Demand for Arbitration, dated June 2, 2008, attached as Exhibit A to the annexed Verified Petition).

5. This action is a civil action of which this Court has original jurisdiction pursuant to 28 U.S.C. § 1332. This action may be removed to this Court by respondent

---

[1] Paramount Farms, by removing the State Court Action to this Court, does not waive its right to challenge the service of the Petition and Proposed Order, nor does Paramount Farms consent to the jurisdiction of this Court or the courts of the State of New York except to the extent necessary to adjudicate the issues raised in the Petition and proposed Orders. Paramount Farms expressly retains its right to contest to the fullest extent of the law any assertion of the jurisdiction of this Court or the courts of the State of New York to adjudicate issues other than those raised in the Petition and proposed Orders (including, but not limited to, the substantive issues raised in the Demand for Arbitration). Paramount Farms removes the State Court Action to this Court without waiving its right to subsequently petition this Court for a change of venue.

Paramount Farms pursuant to 28 U.S.C. § 1441 in that it is a civil action between citizens of different states and, based on the allegations in Verified Petition, which references and attaches the Demand for Arbitration, the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.    Upon information and belief, Petitioner Ventilex B.V. is a Netherlands corporation.

7.    Respondent Paramount Farms, Inc. is a Delaware corporation, with a principal place of business in Los Angeles, California.

8.    This notice has been filed within 30 days from the date upon which Paramount Farms received a copy of the initial pleading.

9.    WHEREFORE, Respondent Paramount Farms, Inc. respectfully requests that this action be removed to this Court and placed on the docket of this Court for further proceedings as though originally instituted in this Court.


Dated:    New York, New York
          June 30, 2008


                              LOEB & LOEB LLP

                              By: _____
                                   Paula K. Colbath (PC-9895)
                                   Manny J. Caixeiro (MC-0218)
                                   345 Park Avenue
                                   New York, New York 10154
                                   212-407-4000

                                   *Attorneys for Respondent Paramount
                                   Farms, Inc.*

# EXHIBIT 1

At IAS Part _____ of the Supreme Court, of the
State of New York, held in and for the County of
New York, at the Courthouse, 60 Centre Street,
New York, New York on the _____ day of June,
2008.

P R E S E N T :

     Hon. _____
                              Justice.

--------------------------------------------------------------- X

In the Matter of the Application of            :

                                       :

VENTILEX B.V.,                           :

                                       :

FOR AN ORDER PURSUANT TO ARTICLE 75 :
OF THE CPLR STAYING ARBITRATION     :

                                       :       Index No.:

                    Petitioner,    :

                                       :       **ORDER TO SHOW CAUSE FOR**

           - against -            :       **STAY OF ARBITRATION**

                                       :       **AND TEMPORARY**

                                       :       <u>**RESTRAINING ORDER**</u>

PARAMOUNT FARMS, INC.,             :

                                       :

                    Respondent.   :

--------------------------------------------------------------- X

      Upon the reading and filing of the annexed Verified Petition dated June 24, 2008,

the Affirmation of Donald H. Chase, Esq., dated June 24, 2008, and the exhibits annexed thereto,

and the Memorandum of Law in Support of Petitioner's Petition for an Order Staying Arbitration

and a Temporary Restraining Order, and sufficient cause having been shown;

      LET Respondent Paramount Farms, Inc. ("Paramount"), or their attorneys, show

cause before this Court at IAS Part _____, at the Courthouse, 60 Centre Street, Room ___, New

York, New York 10007, on the ___ day of July, 2008, at _____ o'clock in the _____ of that day

or as soon thereafter as counsel may be heard, why an Order should not be made and entered

herein, granting the following relief:

#1315131 v1 \18182 \001

Pursuant to CPLR 7503(b), staying the arbitration proceeding as to petitioner Ventilex B.V. commenced by respondent Paramount before the American Arbitration Association.

Sufficient reason appearing therefor, it is hereby

ORDERED, that pending the hearing and determination of this Petition, Paramount is hereby restrained and enjoined from proceeding with the arbitration proceeding against Ventilex B.V. and Ventilex USA, Inc. before the American Arbitration Association; and it is further

ORDERED, that service of a copy of this Order and the papers upon which it is granted, shall be deemed good and sufficient service, if made no later than June __, 2008 by overnight mail to Andrew E. Asch, Roll International Corporation – Legal Department, 11444 West Olympic Boulevard, 10th Floor, Los Angeles, California 90064, Paramount's named counsel in the arbitration proceeding before the American Arbitration Association; and it is further

ORDERED that opposing papers, if any, shall be delivered to Petitioner's attorneys so as to be received by them no later than July __, 2008 and filed with the Court by 5:00 P.M. on or before the __ day of July 2008, and any reply papers shall be delivered to Respondent's attorneys so as to be received by them no later than July __, 2008 and filed with the Court by 5:00 P.M. on or before the ___ day of July 2008.

ENTER

_____
J.S.C.

#1315131 v1 \18182 \001

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

In the Matter of the Application of       :

VENTILEX B.V.,        :    Index No.

        :

FOR AN ORDER PURSUANT TO ARTICLE 75    :
OF THE CPLR STAYING ARBITRATION    :

        :

            Petitioner,    :

- against -        :

        :

PARAMOUNT FARMS, INC,        :

        :

            Respondent.    :

        :

-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF VENTILEX B.V.'S PETITION FOR AN ORDER STAYING ARBITRATION AND A TEMPORARY RESTRAINING ORDER

MORRISON COHEN LLP
909 Third Avenue
New York, NY 10022
(212) 735-8600

*Attorneys for Plaintiff*

Of Counsel:

Donald H. Chase

#1314568 v1 \18182 \001

## PRELIMINARY STATEMENT

Petitioner Ventilex B.V. ("Ventilex Europe"), by its counsel, Morrison Cohen LLP, submits this memorandum of law in support of its petition, brought by order to show cause, for an order pursuant to CPLR § 7503(b) staying the arbitration proceeding commenced by Respondent Paramount Farms, Inc. ("Paramount") against Petitioner before the American Arbitration Association (the "AAA").

## STATEMENT OF FACTS

Petitioner is the parent corporation of Ventilex USA, Inc. ("Ventilex U.S."). In or about November 2005, Ventilex U.S. entered into an agreement to sell its almond pasteurization system to Paramount (the "Contract"). (*See* Affirmation of Donald H. Chase in Support of Motion to Stay Arbitration dated June 24, 2008 (the "Chase Aff."), Ex. B.) The Contract lists only two parties to the agreement, the Owner (named as "Paramount") and the Contractor (named as "Ventilex U.S."). The notice provision in Section 8 of the Contract likewise lists only Ventilex U.S. and Paramount, and the fully executed signature page contains signature blocks for only these two parties. Ventilex Europe is not a party to the Contract and did not execute it. Indeed, there is no mention of or reference to Ventilex Europe anywhere as a party to the Contract.

After execution of the Contract, a dispute arose between Paramount and Ventilex U.S. as to the performance of the almond pasteurization system. On or about June 4, 2008, Paramount served a Demand for Arbitration (the "Arbitration Demand") naming as Respondents both Ventilex U.S. and Ventilex Europe. (*See* Chase Aff., Ex. A.) The nature of the dispute described in the Demand for Arbitration is as follows:

> On or about November 9, 2005, Paramount Farms, Inc. ("PFI")
> purchased an 11 TPH Deluxe Ventilex Nut Pasteurization System
> (the "System") from Ventilex USA, Inc. ("Ventilex").
>
> . . . . .
>
> Ventilex is in breach of each of these contractual provisions in that,
> despite repeated testing and the expenditure of significant
> resources by Paramount, the System has failed to perform as
> warranted.

(*See id.*)

In the Arbitration Demand, the Respondent also quotes from a document that it refers to as the "purchase agreement." (*See id.*)  The quoted language came from one of the documents attached to the Contract called "Paramount Farms Bid # (*Ventilex USA Inc. Proposal #8375H – 11 TPH*)" ("Proposal Letter").  (*See* Chase Aff., Ex. B-1.)  This document is a letter from an officer of Ventilex U.S. to Paramount providing basic proposals on equipment, parts, and installation and it makes only one reference to Ventilex Europe.  This Proposal Letter contains the only reference to Ventilex Europe in the documents that comprise the agreement between the parties.

Finally, in the Arbitration Demand, the Respondent defined the term "Ventilex" as "Ventilex USA, Inc.", noticeably omitting Ventilex Europe from the definition.  Other than in the quote from the Proposal Letter, the Respondent does not mention anything about Ventilex Europe anywhere else in the Arbitration Demand.

## ARGUMENT

### THE ARBITRATION MUST BE STAYED AS TO THE PETITIONER AS IT IS NOT A PARTY TO ANY ARBITRATION AGREEMENT

It is axiomatic that a party cannot be compelled to arbitrate claims where there is no agreement to do so. Indeed, the courts of this State abide by the following well settled doctrine:

> It is a fundamental principle of New York law that in the absence of an agreement to do so, parties cannot be forced to arbitrate . . . An agreement to arbitrate requires a clear and unequivocal manifestation of an intention to arbitrate because it involves the 'surrender [of] the right to resort to the courts' . . .

Mionis v. Bank Julius Baer & Co., 301 A.D.2d 104, 109, 749 N.Y.S.2d 497, 501-502 (1st Dep't 2002) (citations omitted).

Here, there is no dispute as to whether there exists any arbitration provision. It is clear that an arbitration clause has been incorporated into the Contract. However, the Contract at issue was entered into by two, and only two, parties — the Respondent and Ventilex U.S.. The Petitioner is not and was never intended to be a party to the Contract.[1] Accordingly, there is no basis for Paramount's Arbitration Demand against Ventilex Europe. See Allegro Resorts Corp. v. Trans-Americainvest (St. Kitts) Ltd., 1 A.D.3d 269, 270 (1st Dep't 2003) (affirming stay of arbitration because petitioner was not party to contract containing arbitration clause). Nor is there any evidence that Ventilex Europe ever agreed to arbitrate any dispute with Paramount before the AAA. See Harriman Group v. Napolitano, 213 A.D.2d 159, 163, 623 N.Y.S.2d 224, 227 (1st Dep't 1995) ("a party will not be compelled to arbitrate and, thereby, to surrender the right to resort to the courts, absent 'evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes.'"). Since Petitioner was never a party to a contract

---

[1] In addition, Petitioner has never even been formally served with process or the Demand for Arbitration.

with an arbitration provision requiring it to arbitrate a dispute with Paramount, the Petition to stay the arbitration must be granted as a matter of law.

## CONCLUSION

For all of the foregoing reasons as well as those set forth in the accompanying affirmation of Donald H. Chase, Petitioner Ventilex B.V. respectfully requests that the Court grant its petition for a stay of the Arbitration and award such further and additional relief as the Court may deem just and proper.

Dated: New York, New York
      June 24, 2008

MORRISON COHEN LLP

By: _____
      Donald H. Chase

909 Third Avenue
New York, New York 10022
(212) 735-8600

*Attorneys for Petitioner*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
In the Matter of the Application of

:

VENTILEX B.V.,                                                        :

                                    Petitioner,           :

FOR AN ORDER PURSUANT TO ARTICLE 75   :
OF THE CPLR STAYING ARBITRATION

:

        - against -                                               :

PARAMOUNT FARMS, INC.,                                 :

                                    Respondent.         :

------------------------------------------------------------X

Index No.

**VERIFIED PETITION**

       Petitioner Ventilex B.V., by its attorneys, Morrison Cohen LLP, alleges the following as and for its Petition to stay arbitration pursuant to CPLR Article 75:

       1.       Petitioner Ventilex B.V. ("Ventilex Europe") is a Netherlands corporation and is the parent corporation of Ventilex U.S.A., Inc. ("Ventilex U.S."), a Delaware corporation with a principal office located in Middleton, Ohio.

       2.       On information and belief, respondent Paramount Farms, Inc. ("Paramount") is a Delaware corporation with a principal office located in Los Angeles, California, and the world's largest vertically integrated supplier of pistachios and almonds and, among other things, its nut products are sold throughout the United States, including significant sales in New York, under the Sunkist label.

       3.       This is a proceeding under Article 75 of the Civil Practice Law and Rules to stay an arbitration before the American Arbitration Association ("AAA") commenced

by Paramount against Ventilex U.S. and Ventilex Europe in connection with a dispute relating to rights and obligations arising under a contract for the purchase of almond pasteurizing equipment executed by Ventilex U.S. and Paramount (the "Proposal Contract").

4.        Venue is properly laid in New York County on the ground that it is the county in which the AAA is headquartered in the United States and Petitioner, as a foreign company, selected the same as venue.

## FACTUAL BACKGROUND

5.        On or about June 5, 2008, Paramount faxed and mailed to Michael Martell, Esq., an attorney at Morrison Cohen LLP, counsel for Ventilex U.S., a demand for arbitration and statement of claim dated June 2, 2008, (the "Arbitration Demand") in connection with an arbitration proceeding filed with the AAA against Ventilex U.S. and Ventilex Europe, alleging, among other things, that they were liable for breach of contract, breach of warranty, and rescission. Ventilex Europe was never properly served, however, with notice or process. A copy of the Arbitration Demand is attached as Exhibit A.

6.        Paramount's Arbitration Demand lists both Ventilex U.S. and Ventilex Europe as Respondents. The contract at issue, however, was executed only by Ventilex U.S. and Paramount ("the Contract"). A copy of a pertinent part of the Contract was attached as an exhibit to the Arbitration Demand. The Contract was never executed by Ventilex Europe nor is there any indication that Ventilex Europe ever assented to or agreed to be a party to the Contract, much less the arbitration provision at issue. Moreover, even in its description of the nature of the dispute, Paramount only mentions Ventilex U.S. as the party with which it contracted to purchase the almond pasteurizing system. In fact, its defined term "Ventilex" used throughout its description of the dispute only refers to Ventilex U.S. and not Ventilex Europe.

7.         Ventilex Europe previously demanded (through counsel) that it be dismissed as a Respondent to the underlying arbitration proceeding but Paramount has refused to consent to such dismissal to date.

8.         Accordingly, this Petition is brought on a timely basis to stay the arbitration as to Ventilex Europe as it was not a party to the Contract.

WHEREFORE, Petitioner respectfully requests that an order be made herein pursuant to CPLR § 7503 staying the arbitration as to Ventilex Europe and directing that judgment be entered thereon, together with such other and further relief as to the Court deems just and proper.

Dated: June 24, 2008
       New York, New York

MORRISON COHEN LLP

By: _____
       Donald H. Chase
       909 Third Avenue
       New York, New York  10022
       (212) 735-8600

<u>VERIFICATION</u>

Donald H. Chase, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under penalties of perjury:

I am a member of the firm of Morrison Cohen LLP, attorneys for Petitioner Ventilex B.V. I have read the contents of the foregoing Petition to stay arbitration and know the contents thereof are true to the best of my knowledge, except as to matters therein alleged on information and belief and I believe those to be true as well.

The grounds for my knowledge and belief as to the matters asserted in this Petition are my personal knowledge of the arbitration and related proceedings referenced therein, as well as a review of Petitioner's documents.

Dated: June 24, 2008
      New York, New York

Donald H. Chase

# Exhibit A



ROLL INTERNATIONAL CORPORATION

SARAH C. ABBOTT
Counsel - Litigation

June 4, 2008

**Via U.S. Mail**

Mr. Michael Martell
Morrison Cohen LLP
909 Third Avenue
New York, New York 10022

RE:    *Paramount Farms, Inc. v. Ventilex*: Demand for Arbitration

Dear Mr. Martell:

Enclosed please find Plaintiff Paramount Farms, Inc.'s demand for arbitration which is being mailed to American Arbitration Association today.

If you have any questions, please contact me at (310) 966-5786.

Very truly yours,

Sarah C. Abbott

Encl.

cc.    Ventilex USA, Inc. and Ventilex B.V. (via mail)
8106 Beckett Center Drive
West Center OH 45069

American Arbitration Association
*Dispute Resolution Services Worldwide*

## CONSTRUCTION INDUSTRY ARBITRATION RULES
### Demand for Arbitration

**MEDIATION:** *If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box.* ☐
*There is no additional administrative fee for this service.*

| | |
|---|---|
| Name of Respondent<br>Ventilex USA, Inc.; Ventilex B.V. | Name of Representative (if known)<br>Michael Martell |
| Address:<br>8106 Beckett Center Drive | Name of Firm (if applicable)<br>Morrison Cohen LLP |
| | Representative's Address:<br>909 Third Avenue |

| City<br>West Center | State<br>OH | Zip Code<br>45069 | City<br>New York | State<br>NY | Zip Code<br>10022 |
|---|---|---|---|---|---|
| Phone No.<br>(513) 874-4451 | | Fax No.<br>(866) 265-6823 | Phone No.<br>(212) 735-8600 | | Fax No.<br>(212) 735-8708 |
| Email Address:<br>unknown | | | Email Address:<br>mmartell@morrisoncohen.com | | |

The named claimant, a party to an arbitration agreement dated **November 9, 2005**_____, which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration. (Please check one)

**ARBITRATION CLAUSE CONTAINED IN THE FOLLOWING CONTRACT DOCUMENT:** (Please check one)
☐ AIA-American Institute of Architects  ☐ AGC-Associated General Contractors of America  ☐ DBIA-Design Build Institute of America
☐ EJCDC-Engineers Joint Contract Documents Committee  ☐ ASA-American Subcontractors Association  ☐ CMAA-Construction Management Association of America  ☒ Other (specify)_ "Proposal Contract" incorporating Paramount Farms, Inc. "Standard Conditions"_

**THE NATURE OF THE DISPUTE**

Please see attached.

| Dollar Amount of Claim $<br> in excess of $5M | Other Relief Sought: ☒ Attorneys' Fees   ☐ Interest<br>☒ Arbitration Costs  ☐ Punitive/ Exemplary  ☐ Other  **$10,000** |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee):

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Experience with complex commercial disputes involving machinery

Hearing locale Los Angeles, CA_____   (check one) ☒ Requested by Claimant  ☐ Locale provision included in the contract

| Estimated time needed for hearings overall:<br>_____ hours or   3   days. | Specify type of business: Claimant nut processor _____<br>Respondent pasteurization system manufacturer _____ |
|---|---|

**You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA  ☐ Dallas, TX  ☐ East Providence, RI  ☒ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.**

| Signature (may be signed by a representative)  Date:<br>6-2-08 | Name of Representative<br>Andrew E. Asch |
|---|---|
| Name of Claimant<br>Paramount Farms, Inc. | Name of Firm (if applicable)<br>Roll International Corporation -Legal Department |
| Address (to be used in connection with this case)<br>11444 West Olympic Blvd. | Representative's Address<br>11444 West Olympic Blvd., 10th Floor |

| City<br>Los Angeles | State<br>CA | Zip Code<br>90064 | City<br>Los Angeles | State<br>CA | Zip Code<br>90064 |
|---|---|---|---|---|---|
| Phone No.<br>(310) 966-5700 | | Fax No.<br>(310) 966-5758 | Phone No.<br>(310) 966-5700 | | Fax No.<br>(310) 966-5758 |
| Email Address:<br>dszeflin@paramountfarms.com | | | Email Address:<br>aasch@roll.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the A.A.A.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

**Demand for Arbitration**
*Paramount Farms, Inc. v. Ventilex U.S.A., Inc. and Ventilex B.V.*

**Nature of the dispute:**

On or about November 9, 2005, Paramount Farms, Inc. ("PFI") purchased an 11 TPH Deluxe Ventilex Nut Pasteurization System (the "System") from Ventilex USA, Inc. ("Ventilex"). PFI purchased the System from Ventilex in order to ensure that the millions of pounds of almonds it produces and sells to the public each year would be pasteurized and would meet all applicable governmental rules and regulations. PFI's decision to purchase the System from Ventilex was based on repeated oral and written guarantees by Ventilex that the System would be "accepted by the FDA and USDA for the pasteurization of almonds" and that the equipment would be "validated."

Specifically, as part of the purchase agreement, Ventilex guaranteed the System as follows:

VENTILEX USA Inc. and VENTILEX B.V. hereby certifies that the equipment that we supply will be accepted by the FDA and USDA for the Pasteurization of Almonds. The installation will be repeatable, verifiable, and that [sic] data logging will take place, thus allowing for trace ability and long term storage of data.

In addition, VENTILEX will work hand in hand with Paramount Farms to make sure that the "system" is accepted and "validated." VENTILEX guarantees the VENTILEX equipment will be validated and will correct any item found to be deficient at our cost.

The Proposal Contract signed by both parties also contains a provision stating that Ventilex "warrants that all the equipment covered by this quotation will be free of defects due to workmanship and materials for a period of 12 months from start up. Which is estimated to be: (1, March, 2006)."

Paramount's "Standard Conditions," which were expressly incorporated into the Proposal Contract, also provide that:

(a) In addition to warranties, representations and guarantees stated elsewhere in the contract documents, the Contract unconditionally guarantees and warrants that all materials and workmanship furnished hereunder shall be without defect and shall confirm, to the Plans and Specifications, and agrees to replace at its sole expense, and to the satisfaction of [Paramount], any and all materials which may be defective, improperly installed, or which do not conform to the plans and specifications . . .

(b) [Ventilex] shall repair or replace to the satisfaction of [Paramount] any or all such work that may prove defective in workmanship or materials, which is improperly installed, or which does not conform to the plans and specifications, ordinary wear and tear excepted, together with any other work which may be damaged or displaced in so doing.

Ventilex is in breach of each of these contractual provisions in that, despite repeated testing and the expenditure of significant resources by Paramount, the System has failed to perform as warranted. Specifically, it has failed to meet the Almond Board of California's Technical Expert Review Panel ("TERP") standards and TERP has therefore refused to validate the System. Because TERP validation is a required step toward FDA and USDA approval of the System, Paramount has been unable to obtain FDA or USDA approval of the System, despite Ventilex's written guarantee that it would receive this approval. Therefore, by way of this Demand for Arbitration, PFI intends to make claims against Ventilex for breach of contract, breach of warranty (express and implied), and rescission.

PFI is being continually damaged by these breaches in that it has paid in excess of $1,285,000.00 for a system that is virtually worthless to it, and is currently expending tens of thousands of dollars every week in order to send its almonds off-site for required pasteurization. Furthermore, PFI has recently been forced to purchase a replacement pasteurization system at a cost of approximately $1.2 million in order to mitigate its ongoing damages.

In addition to the warranties described above, the Proposal Contract and incorporated documents provide for significant liquidated damages in the event that work under the contract (which included provision of a working pasteurization system that could be validated and approved by relevant governmental entities) was not completed by January 27, 2006, and well as for attorneys' fees to the prevailing party in the event of a dispute. By way of this arbitration, PFI intends to seek these damages and fees in addition to those described above.

{024353.2}

# PROPOSAL CONTRACT

<u>Contract Number:</u>  10348                              <u>CAR#:</u> 1710.9000.10348

<u>Project:</u>  *Almond Pasteurization Equipment*

<u>Owner:</u>  **Paramount Farms**

<u>Contractor:</u>  *Ventilex USA Inc..*

<u>Sub-Contractor:</u>

    This contract is entered into this <u>*9 day of November 2005*</u>, by and between Owner and Contractor, with reference to the following terms:

1.    The "Contract Terms"

    The following documents which are attached hereto and made a part hereof, taken together, constitute the contract ("Contract") between Owner and Contractor:

    (a) This Proposal Contract.
    (b) The Standard Conditions.
    (c) Rules and Regulations (Excluding item B-3).
    (d) The Plans and Specifications from: (*Ventilex USA Inc Proposal #8375H - 11 TPH* )
    (e) Paramount Farms Bid #  (*Ventilex USA Inc.Proposal #P-8375H-11 TPH* ).
    (f) Any change orders issued or to be issued.
    (g) Mechanical Standards & Equipment Memo
    (h) All Equipment to be Stainless Steel.
    (i) All equipment to be shipped FOB Lost Hills, CA.

2.    Price

    The total price for the work to be done under this contract including tax is:

| Location | Description | Cost |
|---|---|---|
| Almonds | Pasteurizer | $199,875.00 |
| Almonds | Control Panel 30" X 55' | $ 46,125.00 |
| Almonds | Fluid Bed Dryer/Cooler | $338,250.00 |
| Almonds | Inlet Rotary Valve | $ 9,225.00 |
| Almonds | C.S. Cyclones | $ 61,500.00 |
| Almonds | Cooling Coil | $ 16,912.50 |
| Almonds | Inlet Additional Chute | $ 3,843.75 |
| Almonds | Microwave Moisture | $ 30,750.00 |
| Almonds | Installation | $ 59,000.00 |

Ventilex Pasteurizer Equipment – Proposal Contract_ (2).doc

Contract Number: 10348                          CAR#: 1710.9000.10348

Quote # P-8375H-11 TPH          Total Cost     $765,481.25

$0,000,000.00) plus shipping at cost.


3.    Payment terms

   a.  Paramount must receive invoice to pay.  Payment to be within 30 days from
       receipt of original invoice only.  This includes down payment.

   b.  All invoices must include the PO number or payment may be delayed.

   c.  The invoices must reflect exact contract coverage or delayed payment may
       result. The contract must be altered to agree with extras and a change order must
       be written to cover the exceptions.

   d.  30% down payment upon receipt of invoice subsequent to signing of this
       contract.

   e.  30% on December 1, 2005 with receipt of invoice.

   f.   30% or January 27, 2006 or upon Shipment if earlier with receipt of invoice.

   g.  10% balance to be paid after completion of all work and the equipment is
       running (processing product).  Operating condition of the equipment must be
       acceptance by Paramount Farms (Not to exceed 45 days).

4.    Progress Schedule and Completion Date

       The work shall commence within seven days from the execution of this Contract.
The work shall be completed cleaned and shipped on or before the *Ship Date of January
27, 2006.*

**NOTE: Any delay due to Paramount Farms will result in an extension of the same
number days.**


5.    Liquidated damages

       Reference is made to Section 26 of the Standard Conditions.  If the work under this
Contract is not completed by the deadline set forth in Paragraph 4 of this Proposal-Contract
(or as it may be extended pursuant to the terms of this Contract), the parties agree that
liquidated damages shall be assessed and paid in the following amounts:


Ventilex Pasteurizer Equipment - Proposal Contract_ (2).doc

Contract Number: 10348                    CAR#: 1710.9000.10348

$ 1,000 per day   (for 1st 5 days beyond completion ship date).
$ 2,000 per day   (for days 6-10 beyond completion ship date).
$ 5,000 per day   (for all days greater than 10 beyond listed completion date).

6.   Plans and Specifications

The work to be carried out by Contractor under this Contract is described in the plans and specifications attached hereto and made a part of this Contract.

7.   Warranty

The Contractor warrants that all the equipment covered by this quotation will be free of defects due to workmanship and materials for a period of 12 months from start up. Which is estimated to be: (1, March, 2006).

8.   Notices

Attention is directed to Section 25 of the Standard Conditions. Notice shall be given as follows:

To Owner:                    Paramount Farms, Inc.
                             13646 Highway 33
                             Lost Hills, CA 93249
                             Attn.: Shawn Tremaine

To Contractor:               Ventilex USA Inc.
                             8106 Beckett Center Drive
                             West Chester, Ohio 45069
                             Attn: Tom Schroeder

VENTILEX USA, INC.            PARAMOUNT FARMS, INC.

By: _____        By: _____

Date: 9 NOV 2005             Date: 11/10/05

Thomas J. Schroeder

Ventilex Pasteurizer Equipment - Proposal Contract_ (2).doc

November 9, 2005

PARAMOUNT FARMS INC.
STANDARD CONDITIONS

1.   Contract Documents

     The following documents ("Contract Documents"), taken together, constitute the contract ("Contract") between owner and Contractor: (a) These Standard Conditions: (b) the Proposal - Contract attached hereto: (c) the Plans and Specifications: and (d) all work change orders issued, or to be issued.

2.   Intent of Contract Documents

     The intent of the Contract Documents is to prescribe the details for the construction and completion of the work which the Contractor undertakes to perform in accordance with the terms of the Contract. Where the Specification and plans described portions of the work in general terms, but not in complete detail, it is understood that only the best general practice is to prevail and that only materials and workmanship of the first quality are to be used. Unless otherwise specified, the Contractor shall furnish all labor, materials, tools, equipment and incidentals and do all the work involved in performing the Contract in a satisfactory and workmanlike manner.

3.   Delivery of Bonds

     (a)  When Contractor delivers the executed Agreement to Owner, Contractor shall also deliver to Owner the following Bonds:

     (b)  Contractor shall furnish performance and payment bonds, each in an amount at least equal to the Contract price as security for the faithful performance and payment of all Contractors obligations under the Contract Documents. These bonds shall remain in effect at least until one year after the date when final payment becomes due, except as otherwise provided by the Proposal - Contract. Contracts shall also furnish such other bonds as are required by the Proposal - Contract. All bonds shall be in a form reasonably acceptable to Owner and shall be executed by such sureties as are named in the current list of "Companies Holding Certificates of Authority as Acceptable Sureties on Federal Bonds and as Acceptable Reinsuring Companies" as published in Circular 570 (amended) by the Audit Staff Bureau of Accounts, U.S. Treasury Department. All bonds signed by an agreement must be accompanied by a certified copy of the authority to act. All required bonds shall be provided to Owner within seven (7) days of execution of this Agreement by both parties.

     (c)  If the surety on any bond furnished by Contractor is declared a bankrupt or becomes insolvent or its right to do business is terminated in any state where any part of the Project is located or it ceases to meet the requirements of paragraph (b) Contractor shall, within five days thereafter, substitute another bond and surety, both of which shall be reasonably acceptable to Owner.

4.   Contract Price

     Owner agrees to pay Contract, for the work described, the total price as set forth on the attached Proposal - Contract, in accordance with the terms and conditions of this Contract.

5.   Starting and Completion Dates

     Work under this contract shall commence by the date sets forth in the Proposal - Contract or within ten (10) days following receipt of the signed contract if no other date is set forth in the Proposal - Contract. The Contractor shall diligently prosecute the work to completion as specified in the Proposal - Contract attached hereto.

6.  Insurance

(a) Neither the contractor nor any subcontractors shall commence any work until all required insurance has been obtained at their own expense. Such insurance must have the approval of the Owner as to limit, form, and amount.

(b) Contractor shall maintain liability insurance in an amount not less than $1,000,000 per person for bodily injury, $500,000 for property damage or a combined single limit of $1,000,000, and shall cover any subcontractors. Owner shall be named as an additional insured on such liability insurance policy.

(c) Contractor shall maintain during construction of the project all-risk property insurance on the project, including materials and equipment to be incorporated in the project and at the site, to its full insurable value, against fire, vandalism, and other perils ordinarily included in extended coverage.

(d) Contractor shall maintain worker compensation insurance to protect Contractor's employees during the progress of the work.

(e) Certificates of insurance evidencing all insurance coverage's required by this Agreement shall be provided to Owner within seven (7) days of execution of this agreement.

(f) The Contractor shall not permit any subcontractor to commence work on this project until such subcontractor has delivered to the owner certificates of insurance evidencing the insurance coverage's required by this paragraph 6.

(g) Any policy or policies of insurance that the Contractor elects to carry as insurance against loss or damage to his construction equipment and tools shall include a provision therein providing a waiver of the insurer's right to subrogation against the Owner.

(h) In Addition to any other remedy the Owner may have if the contractor or any of the subcontractors fail to maintain the insurance coverage as required in this Section, the Owner may obtain such insurance coverage as is not being maintained, in form and amount substantially the same as required herein, and the Owner may deduct the costs of such insurance from any amounts due or which may become due the Contractor under this Contract.

7.  Payments

Contractor shall provide owner with a complete list of all subcontractors, material men, and suppliers which will be providing labor, services, materials, or equipment under this Contract. No progress payment shall be made under this Contract unless and until contractor has provided owner with a conditional waiver and release from such subcontractors, suppliers, and material men substantially in the form set forth in California Civil Code section 3262, at which time Owner shall issue to Contractor and the applicable subcontractors. If at any time any claim or lien is asserted or filed against Owner or the project, then Owner shall have the right to retain out of any payment then due or to become due to Contractor an amount sufficient to discharge such liens or satisfy such claims and to pay all costs and expenses in connection therewith, including attorney's fees and costs. If amounts retained from payments to Contractor are insufficient to reimburse Owner, or a lien or claim remains undercharged or unsatisfied after all payments have been made to Contractor, the Contractor shall pay to Owner all moneys paid by Owner to discharge such lien or claim including attorneys costs and fees.

8.    Construction Staking and Surveys

The Owner will provide the Contractor with drawings showing the benchmarks and reference points as it deems necessary to establish lines and grades required for the completion of any site work specified in the Plans and Specifications. The Contractor shall make or furnish all surveys and set all construction stakes necessary for the completion of the work.

9.    Permits and Regulations

(a) Permits and licenses, of a temporary nature, necessary for the prosecution of the work shall be secured by Contractor and paid for by the Owner. Permits, licenses and assessments for permanent structures or permanent changes in existing facilities shall be paid for by the Owner unless otherwise specified.

(b) The Contractor shall give all notices and comply with all laws, ordinances, rules and regulations bearing on the conduct of the work as shown on the Plans and Specification at variance therewith and any necessary changes shall be adjusted as provided in the Contract for changes in the work. If the Contractor performs any work which it knows or should have known to be contrary to such laws, ordinances, rules, and regulations, and without such notice to the Owner, Contractor shall bear all costs arising therefrom, including, but not limited to, bringing the work into compliance.

10.    Condition of Land

(a) Owner will furnish, as indicated in the plans and specifications, and not later than the date when needed by Contractor, the lands on which the work is to be done, rights-of-way for access thereto, and such other lands, which are designated for the use of Contractor. Owner will, on request, furnish to Contractor copies of any available boundary surveys and subsurface tests.

(b) Unforeseen Subsurface Conditions: Contractor will promptly notify Owner in writing of any subsurface or latent physical conditions at the site differing materially from those indicated in the Contract Documents. Thereafter, Owner will promptly obtain necessary surveys or tests and furnish copies to Contractor. If the results of such surveys or tests indicate subsurface or latent physical conditions differing significantly from those indicated in the Contract Documents, a change order shall be issued incorporating any necessary revisions in the work. Adjustments in the contract price and time for completion shall be made, if required, in accordance with Section 12.

11.    Termination For Default - Damages For Daily - Timely Extension

(a) If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will ensure the completion within the time specified in the Proposal - Contract, or any extension thereof, or fails to complete said work within such time, the Owner may, after giving five (5) days written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay.

(b) The Contractor's right to proceed shall not be so terminated, nor the Contractor charged with resulting damage if:

(1) The delay in the completion of the work arises from causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to Acts of God, acts of a public enemy, acts of the Owner, acts of another contractor in the performance of a Contract with the Owner, fires, floods, epidemics, quarantine restrictions, strikes, lockouts, freight embargoes, unusually severe weather, or delays of subcontractors and suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of either the Contractors or such subcontractors and suppliers.

3

(2) The Contractor, within five (5) days from the beginning of any such delay (unless the Owner grants further period of time before the date of final payment under the Contract), notifies the Owner in writing of the causes of delay and requests an extension of time.

(c) The Owner shall ascertain the facts and the extent of the delay and extend the time for completing the work when, in his reasonable judgment, the findings of fact justify such an extension, and his findings of fact shall be final and conclusive on the parties.

(d) A request for an extension of time, or the fronting of an extension of time, shall not constitute a basis for any claim against the Owner for additional compensation or damages unless caused solely by the Owner or another contractor employed by the Owner.

(e) If the Contractor should file for bankruptcy protection, or if he should make a general assignment for the benefit of his creditors, or if a receiver should be appointed for the benefit of his Contractors, on account of his insolvency and not be discharged within ten (10) days after his appointment, or if the Contractor should fail to make prompt payments to subcontractors or suppliers, or should be persistently disregard laws, ordinance, or the instructions of the Owner, or otherwise commit a substantial violation of any provisions of the Contract, the Owner may, after giving five (5) days written notice to the Contractor, terminate the Contractor and the Contractor's right to proceed with the work.

(f) The rights and remedies of the Owner provided in this paragraph are in addition to any of the rights and remedies provided by law or under this Contract.

(g) In addition to the Owner's rights under this paragraph , if at any time before completion of the work under the Contract, it shall be determined by the Owner that reasons beyond the control of the parties hereto render it impossible or against the interests of the Owner to complete the work, or if the work shall be stopped by an injunction of a court of competent jurisdiction or by order of any competent authority,  the Owner may, upon five (5) days written notice to the Contractor, discontinue the work and terminate the Contract. Upon service of such notice of termination, the Contractor shall discontinue the work in such a manner, sequence, and at such times as the Owner may direct. The Contractor shall have no claim for damages (including, but not limited to, incidental or consequential damages) for such discontinuance or termination, nor any claim for anticipated profits on the work thus dispensed with, nor any other claim except  for the work actually performed up to the time of discontinuance, including any extra work ordered by the Owner to be done.

12.    Work Changes

Owner reserves the right to order work changes in the nature of additions, deletions, or modifications, without invalidating the Contract. All changes must be authorized by a written change in the Contract price and/or the time for completion he shall nevertheless proceed with the ordered work and notify the Owner within ten (10) days of receipt of the change order of the nature and extent of the disagreement.  Contractor and Owner shall negotiate in good faith to resolve any such dispute, and if not resolved the dispute shall be settled by arbitration pursuant to paragraph 27.

13.   Compliance with Laws - Permits, Regulations, Taxes

Contractor is an independent contractor and shall at his sole cost and expense comply with all laws, rules, ordinances and regulations of all governing bodies having jurisdiction over the work, obtain all necessary permits and licenses therefor (other than those which are the responsibility of Owner pursuant to paragraph 9 (a), pay all manufacturer's taxes, sale taxes, use taxes, processing taxes, and all federal and state taxes, insurance and contributions for social security and unemployment which are measured by wages, salaries or any remuneration paid to Contractor's employees, whether levied under existing or subsequently enacted laws, rules or regulations. Contractors shall protect, identify and defend the Owner and all of the Owner's officers, agents, directors, partners, shareholders, affiliates and employees against any claim or liability arising from or based upon the violation of any such law, rule, ordinance, regulation, order or decree, whether by the Contractor itself or by its employee or subcontractors. The Contractor warrants to the Owner that he is licensed by all applicable governmental bodies to perform this Contract and will remain so licensed throughout the progress of the work, and that he has, and will have, throughout the progress of the work, the necessary experience, skill and financial resources to enable him to perform this Contract.

14.   Safety

(a) The Contractor shall be solely and completely responsible for the condition of the job site related to his performance of the work under this Contract, including safety of all persons and property, during performance of the work. This requirement shall apply continuously and not be limited to normal working hours. Safety provisions shall conform to all applicable Federal, State, and local laws, ordinances, and codes, and to the rules and regulations established by the California's Division of Industrial Safety and to other rules of law applicable to the work.

(b) Owner's review of the Contractor's performance is not intended to include review of the adequacy of the Contractor's work methods, equipment, bracing or scaffolding or safety measures, in, on, or near the construction site, and shall not be construed as supervision of the actual construction nor make the Owner responsible for providing a safe place for the performance of work by the Contractor, subcontractors, or suppliers; or for access, visits, use work, travel or occupancy by any person.

15.   Contractor's Guarantee

(a) In addition to warranties, representations and guarantees stated elsewhere in the contract documents, the Contract unconditionally guarantees and warrants that all materials and workmanship furnished hereunder shall be without defect and shall conform to the Plans and Specifications, and agrees to replace at its sole cost and expense, and to the satisfaction of the Owner, any and all materials which may be defective, improperly installed, or which do not conform to the plans and specifications. All wiring shall conform to N.E.C. and Kern County codes. All construction shall conform to C.C.R. Title 8 Division 1 Chapter 4 Subchapter 7.

(b) The Contractor shall repair or replace to the satisfaction of the Owner any or all such work that may prove defective in workmanship or materials, which is improperly installed, or which does not conform to the to the plans and specifications, ordinary wear and tear excepted, together with any other work which may be damaged or displaced in so doing.

(c) In the event of failure to comply with the above stated conditions within a reasonable time, the Owner is authorized to have the defect repaired or replaced at the expense of the Contractor who will pay the costs and charges therefore immediately upon demand, including any reasonable management and administrative costs, and engineering, legal and other consulting fees incurred to enforce this section.

(d) Except as otherwise provided in this Contract, the guarantees and warranties shall remain in effect for one year after the completion of the project.

16.   Protection of Work

5

(a) The Contractor shall use extreme care during construction to prevent damage from dust to crops and adjacent property caused by Contractor. The Contractor, at his own expense, shall provide adequate dust control for the right-of-way and take other preventative measures as directed by the Owner.

(b) The Contractor shall be responsible for all damage to any property resulting from trespass by the Contractor or his employees in the course of their employment, whether such trespass was committed with or without the consent or knowledge of the Contractor.

17.    Accidents

(a) The contractor shall provide and maintain, in accordance with Labor Code Section 6708 and OSHA requirements for his employees and anyone else who may be injured in connection with the work.

(b) The Contractor shall promptly report in writing to the Owner all accidents whatsoever arising out of, or in connection with, the performance of the work, whether on or adjacent to the site, which caused death, personal injury, or property damage, giving full details and statements of witnesses. In addition, if death or serious injury or serious damage are caused, the accidents shall be reported immediately by telephone or messenger to the Owner.

(c) If any claim is made by anyone against the Contractor or any Subcontractor on account to any accident, the Contractor shall promptly report the facts in writing to the Owner, giving full details of the claim.

18.    Ongoing Inspection

All materials and work are subject to ongoing inspection and testing by the Owner or its representatives. These individuals shall at all times have access to the work whenever it is in preparation or progress, and the Contractor shall provide safe and convenient access for such inspection.

19.    Final Inspection

Upon notice from the Contractor that the project is complete, owner will make a final inspection with Contractor and will notify Contractor in writing of any particulars in which this inspection reveals that the work is defective or incomplete. Contractor shall immediately take such actions as are necessary to remedy such defects and complete the work. Thirty-five (35) days after Contractor has completed any such work, final payment shall be due. Under no circumstances shall Owner's inspection or final inspection of the work constitute a waiver of Owner's rights and Contractor's obligations under paragraph 16 of this Contractor ("Contractor's Guarantee").

20.    Clean-up

During the progress of the work, the Contractor shall maintain the site and related structures and equipment in a clean, orderly condition and free from unsightly accumulation of rubbish. Upon completion of work and before the request for final payment is submitted, the Contractor shall at his own cost and expense remove from the vicinity of the work all plants, buildings, rubbish, unused work materials, concrete forms, and temporary bridging and other like materials, belonging to him or used under his direction during the construction, and in the event of his failure to do so, the same may be removed by the Owner after five (5) days notice to the Contractor, such removal to be at the expense of the Contractor. Where the construction has crossed yards or driveways, they shall be restored by the Contractor to the complete satisfaction of the owner, at the Contractor's expense.

6

21.    Title

       Title to any materials supplied by Contractor will pass to owner upon delivery of such materials to the job site and acceptance of such materials by Owner.

22.    Waiver of Interest

       The Owner shall have no obligation to pay and the Contractor hereby waives the right to recover interest with regard to moneys which the Owner is required to withhold by reason of judgment, order, statute, or judicial process.

23.    Assignment; Subcontracting

       The Contractor shall not assign the Contract, as a whole or in part, without the written consent of the Owner, nor shall the Contractor assign any moneys due, or to become due to him hereafter, without the prior written consent of the Owner.

24.    Ownership of Plans

       If plans or specification have been furnished for this work by Owner or an architect, Owner shall retain all ownership rights to the plans and any rights to duplicate them.

25.    Notice

       Any and all notices or other matters required or permitted by this Agreement or by law to be served on, given to, or delivered to either party hereto, owner or contractor, by the other party to this Agreement, shall be in writing and shall be deemed duly served, given or delivered when personal service, when deposited in the United States mail, first-class postage paid, addressed to Owner or to the Contractor at the address set forth in the Proposal-Contract. Either party, Owner or Contractor, may change its address for the purpose of this paragraph by giving written notice of such change to the other party in the manner provided by this paragraph.

26.    Failure to Complete the Work in the Time Agreed Upon Liquidated Damages

(a) It is agreed by the contracting parties that time is of the essence as to each provision of this Contract. If Contractor fails to complete the work under this Contract before or upon the expiration of the time limit as set forth in the Proposal-Contract, or within any time extensions that may have been granted, the parties hereto, agree that actual and serious damage will be sustained by the Owner in the conduct of its business and that from the nature of the circumstances it would be impracticable and extremely difficult to determine the actual amount of damage by reason of such failure. It is, therefore, stipulated and agreed that the Contractor shall pay to the Owners as liquidated damages the amount or amounts per day set forth in the Proposal-Contract for each and every day's delay in completing the work in excess of the number of days specified. The parties expressly agree that this liquidation damage clause is reasonable under the circumstances existing at the time the Contract was made and the amounts are payable as damages and not as a penalty. The Owner shall have the right to deduct the amount of liquidated damages from any money due or to become due the contractor.

(b) In addition to the liquidated damages specified above which are intended to reimburse Owner for damages suffered in the conduct of its business, Owner shall have the right to charge to the Contractor and to deduct from the final or progress payments for the work the actual cost to the Owner of legal, engineering, inspection, superintendent, and other expenses, which are directly chargeable to the Contract and which accrue during the period of such delay, except that the cost of final inspection and preparation of the final estimate shall not be included in the charges. Should this Contract be terminated by Owner for breach of this Contract, Owner shall also have the right to charge the Contractor for the actual cost of completion of the project over and above the contract price.

27.    Arbitration

All claims, disputes, and other matters in question between Owner and Contractor arising out of, or relating to the Contract Documents or the breach thereof (except for claims which have been waived by the making of acceptance of final payment) will be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. This agreement to arbitrate will be specifically enforceable under the prevailing law of any court having jurisdiction.

28.    Indemnity and Litigation Cost

(a)  The Contractor specifically obligates itself and hereby agrees to protect, hold free and harmless, defend and indemnify the Owner, and its consultants, and each of their officers, directors, partners, affiliates, employees and agents, from any and all liability, penalties, cost, losses, damages, expenses, causes of action, claims or judgments, including attorney's fees, which arise out of or are in any way connected with the Contractor's, or its subcontractors' or suppliers' act, omission, or performance of work under this contract. To the extent legally permissible, this indemnity and hold harmless agreement by the Contractor shall apply to any acts or omissions, whether active or passive, on the part of the Contractor or its agents, employees, representatives, resulting in liability irrespective of whether or not any acts or omissions of the parties to be indemnified here under may also have been a contributing factor to the liability. This obligation shall not be continued to negate, abridge or otherwise reduce any right of indemnification which the Contractor may have as to any other person.

(b)  In any and all claims against the Owner and its consultants, and each of their officers, employees and agents by any employee of the Contractor, any subcontractor, anyone directly or indirectly employed by any of them, or anyone for whose acts any of them may be liable, the indemnification obligation under this section shall not be limited in any way by limitations on the amount or type of damages, compensation or benefits payable by or for the Contractor or any Subcontractor under worker's compensation statutes, disability benefit statutes or other employee benefit statutes.

29.    Binding On Successors in Interest

This agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

30.    Attorney's Fees

If either party becomes involved in arbitration or litigation arising out of this Contract or the performance or enforcement of it, then the party prevailing in such arbitration or litigation shall be entitled to reasonable attorney's fees and expert witnesses' fees, in addition to other costs, expenses and disbursements.

31.    Contractor's License Notice

CONTRACTORS ARE REQUIRED BY LAW TO BE LICENSED AND REGULATED BY THE CONSTRUCTORS' STATE LICENSE BOARD. ANY QUESTIONS CONCERNING A CONTRACTOR MAY BE RENDERED TO THE REGISTRAR, CONTRACTORS' STATE LICENSE BOARD, 3132 BRADSHAW ROAD, SACRAMENTO, CALIFORNIA. MAILING ADDRESS: P.O. BOX 26000, SACRAMENTO, CALIFORNIA 95826.

32.   Miscellaneous

(a)  The waiver by either party of any default of the terms of this Contract shall not be deemed a waiver of any subsequent default.  The remedies and rights of the parties in the event of any default, are cumulative and in addition to those given by law, and the expression herein of any specified right or remedy shall not be construed a limiting the parties from exercising any other right or remedy they may have.

(b)  This contract supersedes all prior negotiations, proposals and understandings, of any of the parties hereto, and constitutes the entire understanding of the parties with reference to the work to be performed under this contract.  This Contract shall not be modified except by a writing signed by all of the parties, or pursuant to Section 13.

(c)  Any term or provision hereof that may be held invalid, void, or unenforceable for any reason by a court of competent jurisdiction shall be ineffective only to the extent of such invalidity or unenforceability, and the balance hereof shall remain in full force and effect.

9

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------X

In the Matter of the Application of              :
                                                 :
VENTILEX B.V.,                                   :    Index No.
                                                 :
FOR AN ORDER PURSUANT TO ARTICLE 75              :
OF THE CPLR STAYING ARBITRATION                  :
                                                 :
                            Petitioner,          :    **AFFIRMATION OF DONALD**
            - against -                          :    **H. CHASE IN SUPPORT OF**
                                                 :    **PETITION TO STAY ARBITRATION**
                                                 :
PARAMOUNT FARMS, INC.,                           :
                                                 :
                            Respondent.          :
                                                 :
------------------------------------------------------------------X

    Donald H. Chase, an attorney duly admitted to practice before the Courts of

the State of New York, affirms the following to be true under penalty of perjury:

    1.  I am a member of the law firm of Morrison Cohen LLP, attorneys for

Petitioner Ventilex B.V. ("Ventilex Europe"), in the above-captioned special proceeding

pursuant to Article 75 of the CPLR. I am fully familiar with the facts and circumstances set forth

in this affirmation based upon my review of the relevant documents and papers which are

attached to this affirmation and the Verified Petition.

    2.  I submit this affirmation in support of Ventilex Europe's petition to stay

the arbitration proceeding commenced by Paramount Farms, Inc. ("Paramount") against Ventilex

Europe before the American Arbitration Association ("AAA"). A true and correct copy of

Respondent's Demand for Arbitration before the American Arbitration Association dated June 2,

2008 is attached as Exhibit A to the Petition, which is itself attached as Exhibit A to this

Affirmation.

3.      In or about November 2005, Petitioner's U.S. subsidiary, Ventilex USA, Inc. ("Ventilex U.S."), and Paramount entered into a contract for the purchase of almond pasteurizing equipment.  A true and correct copy of this contract between Paramount and Ventilex U.S. with all relevant exhibits thereto ("the Contract") is attached hereto as Exhibit B.

4.      Following the execution of the Contract, a dispute arose between Ventilex U.S. and Paramount as to the performance of the almond pasteurization system.  Paramount thereafter filed a Demand for Arbitration dated June 2, 2008 with the AAA.  The Demand for Arbitration lists Ventilex U.S. and Ventilex Europe as parties even though Ventilex Europe was never a party to the Contract.  The Demand for Arbitration was subsequently faxed and mailed to my partner, Michael Martell, Esq., as counsel for Ventilex U.S. on or about June 5, 2008.  The sole address listed in the Demand for Arbitration for Ventilex Europe is in fact the address of Ventilex U.S. and, upon information and belief, Ventilex Europe was never properly served with the Demand for Arbitration.

5.      This special proceeding is based on the simple proposition that Ventilex Europe cannot be compelled to participate in an arbitration before the AAA because it never agreed to such arbitration, and indeed never executed or entered into any agreement to arbitrate with Paramount.  As more fully set forth in the accompanying memorandum of law, Petitioner's petition to stay the arbitration must be granted as a fundamental matter of law because the Petitioner is simply not a party to any agreement to arbitrate with the Respondent.

6.      I have had several conversations with Respondent's counsel explaining that it was the Petitioner's position that it had been inappropriately named in the arbitration proceeding.  I pointed out that the Petitioner was not a party to the Contract and had not signed any agreement to arbitrate the claims brought by the Respondent.  The Respondent never pointed

to any agreement executed by Ventilex Europe with Paramount or any document evidencing that the Petitioner ever agreed to arbitration with the Respondent.

       7.    Indeed, the sole document that Respondent relied upon for its argument that Petitioner should be a party to the arbitration is a single reference contained in a proposal submitted by Ventilex U.S. to Paramount ("Proposal Letter"). A true and correct copy of this proposal is attached hereto as Exhibit B-1. This proposal is nothing more than a letter from the President of Ventilex U.S. briefly outlining the proposed terms concerning the equipment being sold by Ventilex U.S., its parts and its installation, and cannot possibly be construed as binding Ventilex Europe to any arbitration proceeding.

       8.    Even if, for argument's sake, the Proposal Letter could somehow be construed as making the Petitioner a party to the Contract, the quotations accompanying and incorporated into the Ventilex Proposal Letter also incorporate terms and conditions that in fact would require any arbitration to be conducted under the Rules of Arbitration of the International Chamber of Commerce not the AAA. A true and correct copy of this quotations document and the incorporated terms and conditions are attached hereto as Exhibit B-2. Thus, even if Respondent's argument were accorded any weight whatsoever, the petition to stay the arbitration before the AAA must still be granted since any arbitration would have to be brought before the International Chamber of Commerce rather than AAA.

       9.    In any event, since Petitioner never executed or entered into any agreement to arbitrate a dispute with Respondent before the AAA, it is clear that the Petitioner's motion to stay arbitration must be granted.

#1314629 v1 \18182 \001

3

**PETITIONER'S REQUEST FOR A TEMPORARY**
**STAY PENDING RESOLUTION OF THIS MOTION**

10.    We received notification from the American Arbitration Association on June 10, 2008 that an administrative conference was scheduled in the arbitration for June 18, 2007, and that the AAA intended to proceed with the administration of the arbitration absent an order of the Court. A copy of the AAA correspondence is attached hereto as Exhibit C. The administrative conference was thereafter adjourned to June 23, 2008 and took place at that time. During the administrative conference with the AAA, I again made the argument that the Petitioner is not party to any arbitration agreement. Respondent's counsel, however, continued to decline to drop Ventilex Europe as a party to the arbitration. The AAA indicated that it was prepared to proceed in the absence of a Court Order. Respondent's counsel indicated (as he had before) that he would speak to his client and get back to me. To date, I have not received a response.

11.    Petitioner's answer to the Arbitration Demand is currently due tomorrow and, absent this filing, Petitioner could possibly be construed to have waived its objections to the arbitability of the dispute.

12.    Accordingly, we respectfully request that the Court grant a temporary stay of the administration of the arbitration proceeding pending the Court's determination of this motion for a permanent stay.

13.    The requested temporary stay is clearly justified under these circumstances since: (a) Petitioner's rights may be irreparably harmed in the interim if the arbitration proceeds under these circumstances where it is clearly unwarranted; (b) Petitioner is likely to succeed on the merits for all the reasons set forth above; and (c) the balancing of the

equities clearly favors a temporary stay since Respondents will suffer no harm or prejudice as a result of the stay, and Petitioner's rights on the other hand may be irreparably impaired.

14.     A copy of all our motion papers has been provided to Respondent's counsel by facsimile prior to the filing of this motion, so Respondent is aware of this request for a temporary stay.

15.     No prior application has been submitted for the relief requested herein.

Dated: New York, New York
       June 24, 2008

                                        _Donald H. Chase_

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X
In the Matter of the Application of

:

VENTILEX B.V.,                                                :

       Petitioner,  :

FOR AN ORDER PURSUANT TO ARTICLE 75 :
OF THE CPLR STAYING ARBITRATION

:

  - against -       :

PARAMOUNT FARMS, INC.,     :

       Respondent.  :
-------------------------------------------------------------X

Index No.

**<u>VERIFIED PETITION</u>**

    Petitioner Ventilex B.V., by its attorneys, Morrison Cohen LLP, alleges the following as and for its Petition to stay arbitration pursuant to CPLR Article 75:

    1.    Petitioner Ventilex B.V. ("Ventilex Europe") is a Netherlands corporation and is the parent corporation of Ventilex U.S.A., Inc. ("Ventilex U.S."), a Delaware corporation with a principal office located in Middleton, Ohio.

    2.    On information and belief, respondent Paramount Farms, Inc. ("Paramount") is a Delaware corporation with a principal office located in Los Angeles, California, and the world's largest vertically integrated supplier of pistachios and almonds and, among other things, its nut products are sold throughout the United States, including significant sales in New York, under the Sunkist label.

    3.    This is a proceeding under Article 75 of the Civil Practice Law and Rules to stay an arbitration before the American Arbitration Association ("AAA") commenced

by Paramount against Ventilex U.S. and Ventilex Europe in connection with a dispute relating to rights and obligations arising under a contract for the purchase of almond pasteurizing equipment executed by Ventilex U.S. and Paramount (the "Proposal Contract").

4.        Venue is properly laid in New York County on the ground that it is the county in which the AAA is headquartered in the United States and Petitioner, as a foreign company, selected the same as venue.

## FACTUAL BACKGROUND

5.        On or about June 5, 2008, Paramount faxed and mailed to Michael Martell, Esq., an attorney at Morrison Cohen LLP, counsel for Ventilex U.S., a demand for arbitration and statement of claim dated June 2, 2008, (the "Arbitration Demand") in connection with an arbitration proceeding filed with the AAA against Ventilex U.S. and Ventilex Europe, alleging, among other things, that they were liable for breach of contract, breach of warranty, and rescission. Ventilex Europe was never properly served, however, with notice or process. A copy of the Arbitration Demand is attached as Exhibit A.

6.        Paramount's Arbitration Demand lists both Ventilex U.S. and Ventilex Europe as Respondents. The contract at issue, however, was executed only by Ventilex U.S. and Paramount ("the Contract"). A copy of a pertinent part of the Contract was attached as an exhibit to the Arbitration Demand. The Contract was never executed by Ventilex Europe nor is there any indication that Ventilex Europe ever assented to or agreed to be a party to the Contract, much less the arbitration provision at issue. Moreover, even in its description of the nature of the dispute, Paramount only mentions Ventilex U.S. as the party with which it contracted to purchase the almond pasteurizing system. In fact, its defined term "Ventilex" used throughout its description of the dispute only refers to Ventilex U.S. and not Ventilex Europe.

7.     Ventilex Europe previously demanded (through counsel) that it be dismissed as a Respondent to the underlying arbitration proceeding but Paramount has refused to consent to such dismissal to date.

8.     Accordingly, this Petition is brought on a timely basis to stay the arbitration as to Ventilex Europe as it was not a party to the Contract.

WHEREFORE, Petitioner respectfully requests that an order be made herein pursuant to CPLR § 7503 staying the arbitration as to Ventilex Europe and directing that judgment be entered thereon, together with such other and further relief as to the Court deems just and proper.

Dated: June 24, 2008
       New York, New York

                                        MORRISON COHEN LLP

                                        By: _____
                                            Donald H. Chase
                                            909 Third Avenue
                                            New York, New York  10022
                                            (212) 735-8600

<u>VERIFICATION</u>

Donald H. Chase, an attorney duly admitted to practice before the Courts of the State of New York, affirms the following to be true under penalties of perjury:

I am a member of the firm of Morrison Cohen LLP, attorneys for Petitioner Ventilex B.V. I have read the contents of the foregoing Petition to stay arbitration and know the contents thereof are true to the best of my knowledge, except as to matters therein alleged on information and belief and I believe those to be true as well.

The grounds for my knowledge and belief as to the matters asserted in this Petition are my personal knowledge of the arbitration and related proceedings referenced therein, as well as a review of Petitioner's documents.


Dated: June 24, 2008
      New York, New York

                                            Donald H. Chase

# Exhibit A



ROLL INTERNATIONAL CORPORATION

SARAH C. ABBOTT
Counsel - Litigation

June 4, 2008

<u>Via U.S. Mail</u>

Mr. Michael Martell
Morrison Cohen LLP
909 Third Avenue
New York, New York 10022

     RE:    *Paramount Farms, Inc. v. Ventilex*: <u>Demand for Arbitration</u>

Dear Mr. Martell:

     Enclosed please find Plaintiff Paramount Farms, Inc.'s demand for arbitration which is being mailed to American Arbitration Association today.

     If you have any questions, please contact me at (310) 966-5786.

                   Very truly yours,

                   Sarah C. Abbott

Encl.

cc.    Ventilex USA, Inc. and Ventilex B.V. (via mail)
       8106 Beckett Center Drive
       West Center OH 45069

American Arbitration Association
*Dispute Resolution Services Worldwide*

## CONSTRUCTION INDUSTRY ARBITRATION RULES
### Demand for Arbitration

| | |
|---|---|
| *MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box. ☐* <br> *There is no additional administrative fee for this service.* | |

| Name of Respondent <br> Ventilex USA, Inc.; Ventilex B.V. | | | Name of Representative (if known) <br> Michael Martell | | |
|---|---|---|---|---|---|
| Address: <br> 8106 Beckett Center Drive | | | Name of Firm (if applicable) <br> Morrison Cohen LLP | | |
| | | | Representative's Address: <br> 909 Third Avenue | | |
| City <br> West Center | State <br> OH | Zip Code <br> 45069 | City <br> New York | State <br> NY | Zip Code <br> 10022 |
| Phone No. <br> (513) 874-4451 | | Fax No. <br> (866) 265-6823 | Phone No. <br> (212) 735-8600 | | Fax No. <br> (212) 735-8708 |
| Email Address: <br> unknown | | | Email Address: <br> mmartell@morrisoncohen.com | | |

The named claimant, a party to an arbitration agreement dated November 9, 2005 _____, which provides for arbitration under the Construction Industry Rules of the American Arbitration Association, hereby demands arbitration.

ARBITRATION CLAUSE CONTAINED IN THE FOLLOWING CONTRACT DOCUMENT: (Please check one)
☐ AIA–American Institute of Architects  ☐ AGC–Associated General Contractors of America  ☐ DBIA–Design Build Institute of America
☐ EJCDC–Engineers Joint Contract Documents Committee  ☐ ASA–American Subcontractors Association  ☐ CMAA–Construction Management
Association of America  ☒ Other (specify) _ "Proposal Contract" incorporating Paramount Farms, Inc. "Standard Conditions"

THE NATURE OF THE DISPUTE

Please see attached.

| Dollar Amount of Claim $ <br> in excess of $5M | Other Relief Sought:  ☒ Attorneys' Fees   ☐ Interest <br> ☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other  $10,000 |
|---|---|

AMOUNT OF FILING FEE ENCLOSED WITH THIS DEMAND (please refer to the fee schedule in the rules for the appropriate fee) $

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:
Experience with complex commercial disputes involving machinery

Hearing locale Los Angeles, CA _____    (check one) ☒ Requested by Claimant  ☐ Locale provision included in the contract

| Estimated time needed for hearings overall: <br><br> _____ hours or  3  days | Specify type of business: Claimant nut processor <br><br> Respondent pasteurization system manufacturer |
|---|---|

**You are hereby notified that copies of our arbitration agreement and this demand are being filed with the American Arbitration Association's Case Management Center, located in (check one)  ☐ Atlanta, GA   ☐ Dallas, TX   ☐ East Providence, RI  ☒ Fresno, CA  ☐ International Centre, NY, with a request that it commence administration of the arbitration.  Under the rules, you may file an answering statement within fifteen days after notice from the AAA.**

| Signature (may be signed by a representative)    Date: <br> 6-2-08 | Name of Representative <br> Andrew E. Asch |
|---|---|
| Name of Claimant <br> Paramount Farms, Inc. | Name of Firm (if applicable) <br> Roll International Corporation -Legal Department |
| Address (to be used in connection with this case) <br> 11444 West Olympic Blvd. | Representative's Address <br> 11444 West Olympic Blvd., 10th Floor |

| City <br> Los Angeles | State <br> CA | Zip Code <br> 90064 | City <br> Los Angeles | State <br> CA | Zip Code <br> 90064 |
|---|---|---|---|---|---|
| Phone No. <br> (310) 966-5700 | | Fax No. <br> (310) 966-5758 | Phone No. <br> (310) 966-5700 | | Fax No. <br> (310) 966-5758 |
| Email Address: <br> dszeflin@paramountfarms.com | | | Email Address: <br> aasch@roll.com | | |

To begin proceedings, please send two copies of this Demand and the Arbitration Agreement, along with the filing fee as provided for in the Rules, to the AAA.  Send the original Demand to the Respondent.

Please visit our website at www.adr.org if you would like to file this case online.  AAA Customer Service can be reached at 800-778-7879

**Demand for Arbitration**
*Paramount Farms, Inc. v. Ventilex U.S.A., Inc. and Ventilex B.V.*

**Nature of the dispute:**

On or about November 9, 2005, Paramount Farms, Inc. ("PFI") purchased an 11 TPH Deluxe Ventilex Nut Pasteurization System (the "System") from Ventilex USA, Inc. ("Ventilex"). PFI purchased the System from Ventilex in order to ensure that the millions of pounds of almonds it produces and sells to the public each year would be pasteurized and would meet all applicable governmental rules and regulations. PFI's decision to purchase the System from Ventilex was based on repeated oral and written guarantees by Ventilex that the System would be "accepted by the FDA and USDA for the pasteurization of almonds" and that the equipment would be "validated."

Specifically, as part of the purchase agreement, Ventilex guaranteed the System as follows:

VENTILEX USA Inc. and VENTILEX B.V. hereby certifies that the equipment that we supply will be accepted by the FDA and USDA for the Pasteurization of Almonds. The installation will be repeatable, verifiable, and that [sic] data logging will take place, thus allowing for trace ability and long term storage of data.

In addition, VENTILEX will work hand in hand with Paramount Farms to make sure that the "system" is accepted and "validated." VENTILEX guarantees the VENTILEX equipment will be validated and will correct any item found to be deficient at our cost.

The Proposal Contract signed by both parties also contains a provision stating that Ventilex "warrants that all the equipment covered by this quotation will be free of defects due to workmanship and materials for a period of 12 months from start up. Which is estimated to be: (1, March, 2006)."

Paramount's "Standard Conditions," which were expressly incorporated into the Proposal Contract, also provide that:

(a) In addition to warranties, representations and guarantees stated elsewhere in the contract documents, the Contract unconditionally guarantees and warrants that all materials and workmanship furnished hereunder shall be without defect and shall confirm, to the Plans and Specifications, and agrees to replace at its sole expense, and to the satisfaction of [Paramount], any and all materials which may be defective, improperly installed, or which do not conform to the plans and specifications . . .

(b) [Ventilex] shall repair or replace to the satisfaction of [Paramount] any or all such work that may prove defective in workmanship or materials, which is improperly installed, or which does not conform to the plans and specifications, ordinary wear and tear excepted, together with any other work which may be damaged or displaced in so doing.

Ventilex is in breach of each of these contractual provisions in that, despite repeated testing and the expenditure of significant resources by Paramount, the System has failed to perform as warranted. Specifically, it has failed to meet the Almond Board of California's Technical Expert Review Panel ("TERP") standards and TERP has therefore refused to validate the System. Because TERP validation is a required step toward FDA and USDA approval of the System, Paramount has been unable to obtain FDA or USDA approval of the System, despite Ventilex's written guarantee that it would receive this approval. Therefore, by way of this Demand for Arbitration, PFI intends to make claims against Ventilex for breach of contract, breach of warranty (express and implied), and rescission.

PFI is being continually damaged by these breaches in that it has paid in excess of $1,285,000.00 for a system that is virtually worthless to it, and is currently expending tens of thousands of dollars every week in order to send its almonds off-site for required pasteurization. Furthermore, PFI has recently been forced to purchase a replacement pasteurization system at a cost of approximately $1.2 million in order to mitigate its ongoing damages.

In addition to the warranties described above, the Proposal Contract and incorporated documents provide for significant liquidated damages in the event that work under the contract (which included provision of a working pasteurization system that could be validated and approved by relevant governmental entities) was not completed by January 27, 2006, and well as for attorneys' fees to the prevailing party in the event of a dispute. By way of this arbitration, PFI intends to seek these damages and fees in addition to those described above.

{024353.2}

# PROPOSAL CONTRACT

Contract Number: 10348                          CAR#: 1710.9000.10348

Project: *Almond Pasteurization Equipment*

Owner: Paramount Farms

Contractor: *Ventilex USA Inc..*

Sub-Contractor:

This contract is entered into this *9 day of November 2005*, by and between Owner and Contractor, with reference to the following terms:

1.    The "Contract Terms"

The following documents which are attached hereto and made a part hereof, taken together, constitute the contract ("Contract") between Owner and Contractor:

   (a) This Proposal Contract.
   (b) The Standard Conditions.
   (c) Rules and Regulations (Excluding item B-3).
   (d) The Plans and Specifications from: (*Ventilex USA Inc Proposal #8375H – 11 TPH* )
   (e) Paramount Farms Bid # (*Ventilex USA Inc.Proposal #P-8375H-11 TPH* ).
   (f) Any change orders issued or to be issued.
   (g) Mechanical Standards & Equipment Memo
   (h) All Equipment to be Stainless Steel.
   (i) All equipment to be shipped FOB Lost Hills, CA.

2.    Price

The total price for the work to be done under this contract including tax is:

| Location | Description | Cost |
|----------|-------------|------|
| Almonds | Pasteurizer | $199,875.00 |
| Almonds | Control Panel 30" X 55' | $ 46,125.00 |
| Almonds | Fluid Bed Dryer/Cooler | $338,250.00 |
| Almonds | Inlet Rotary Valve | $ 9,225.00 |
| Almonds | C.S. Cyclones | $ 61,500.00 |
| Almonds | Cooling Coil | $ 16,912.50 |
| Almonds | Inlet Additional Chute | $ 3,843.75 |
| Almonds | Microwave Moisture | $ 30,750.00 |
| Almonds | Installation | $ 59,000.00 |

Contract Number: 10348                              CAR#: 1710.9000.10348

Quote # P-8375H-11 TPH            Total Cost    $765,481.25

$0,000,000.00) plus shipping at cost.


3.    Payment terms

    a.  Paramount must receive invoice to pay.  Payment to be within 30 days from receipt of original invoice only.  This includes down payment.

    b.  All invoices must include the PO number or payment may be delayed.

    c.  The invoices must reflect exact contract coverage or delayed payment may result. The contract must be altered to agree with extras and a change order must be written to cover the exceptions.

    d.  30% down payment upon receipt of invoice subsequent to signing of this contract.

    e.  30% on December 1, 2005 with receipt of invoice.

    f.  30% or January 27, 2006 or upon Shipment if earlier with receipt of invoice.

    g.  10% balance to be paid after completion of all work and the equipment is running (processing product).  Operating condition of the equipment must be acceptance by Paramount Farms (Not to exceed 45 days).

4.    Progress Schedule and Completion Date

The work shall commence within seven days from the execution of this Contract. The work shall be completed cleaned and shipped on or before the *Ship Date of January 27, 2006.*

NOTE: Any delay due to Paramount Farms will result in an extension of the same number days.


5.    Liquidated damages

Reference is made to Section 26 of the Standard Conditions.  If the work under this Contract is not completed by the deadline set forth in Paragraph 4 of this Proposal-Contract (or as it may be extended pursuant to the terms of this Contract), the parties agree that liquidated damages shall be assessed and paid in the following amounts:

Ventilex Pasteurizer Equipment - Proposal Contract_ (2).doc

Contract Number: 10348                                    CAR#: 1710.9000.10348

$ 1,000 per day      (for 1<sup>st</sup> 5 days beyond completion ship date).
$ 2,000 per day      (for days 6-10 beyond completion ship date).
$ 5,000 per day      (for all days greater than 10 beyond listed completion
date).

6.    Plans and Specifications

The work to be carried out by Contractor under this Contract is described in the plans and specifications attached hereto and made a part of this Contract.

7.    Warranty

The Contractor warrants that all the equipment covered by this quotation will be free of defects due to workmanship and materials for a period of 12 months from start up. Which is estimated to be: (1, March, 2006).

8.    Notices

Attention is directed to Section 25 of the Standard Conditions. Notice shall be given as follows:

To Owner:                        Paramount Farms, Inc.
                                 13646 Highway 33
                                 Lost Hills, CA 93249
                                 Attn.: Shawn Tremaine

To Contractor:                   Ventilex USA Inc.
                                 8106 Beckett Center Drive
                                 West Chester, Ohio 45069
                                 Attn: Tom Schroeder

VENTILEX USA, INC.               PARAMOUNT FARMS, INC.

By: _____             By: _____

Date: 9 NOV 2005                 Date: 11/10/05

        Thomas J. Schroeder

Ventilex Pastsurizer Equipment – Proposal Contract_ (2).doc

November 9, 2005

PARAMOUNT FARMS INC.
STANDARD CONDITIONS

1.    Contract Documents

The following documents ("Contract Documents"), taken together, constitute the contract ("Contract") between owner and Contractor: (a) These Standard Conditions: (b) the Proposal - Contract attached hereto: (c) the Plans and Specifications: and (d) all work change orders issued, or to be issued.

2.    Intent of Contract Documents

The intent of the Contract Documents is to prescribe the details for the construction and completion of the work which the Contractor undertakes to perform in accordance with the terms of the Contract. Where the Specification and plans described portions of the work in general terms, but not in complete detail, it is understood that only the best general practice is to prevail and that only materials and workmanship of the first quality are to be used. Unless otherwise specified, the Contractor shall furnish all labor, materials, tools, equipment and incidentals and do all the work involved in performing the Contract in a satisfactory and workmanlike manner.

3.    Delivery of Bonds

(a)  When Contractor delivers the executed Agreement to Owner, Contractor shall also deliver to Owner the following Bonds:

(b).  Contractor shall furnish performance and payment bonds, each in an amount at least equal to the Contract price as security for the faithful performance and payment of all Contractors obligations under the Contract Documents. These bonds shall remain in effect at least until one year after the date when final payment becomes due, except as otherwise provided by the Proposal - Contract. Contracts shall also furnish such other bonds as are required by the Proposal - Contract. All bonds shall be in a form reasonably acceptable to Owner and shall be executed by such sureties as are named in the current list of "Companies Holding Certificates of Authority as Acceptable Sureties on Federal Bonds and as Acceptable Reinsuring Companies" as published in Circular 570 (amended) by the Audit Staff Bureau of Accounts, U.S. Treasury Department. All bonds signed by an agreement must be accompanied by a certified copy of the authority to act. All required bonds shall be provided to Owner within seven (7) days of execution of this Agreement by both parties.

(c)  If the surety on any bond furnished by Contractor is declared a bankrupt or becomes insolvent or its right to do business is terminated in any state where any part of the Project is located or it ceases to meet the requirements of paragraph (b) Contractor shall, within five days thereafter, substitute another bond and surety, both of which shall be reasonably acceptable to Owner.

4.    Contract Price

Owner agrees to pay Contract, for the work described, the total price as set forth on the attached Proposal - Contract, in accordance with the terms and conditions of this Contract.

5.    Starting and Completion Dates

Work under this contract shall commence by the date sets forth in the Proposal - Contract or within ten (10) days following receipt of the signed contract if no other date is set forth in the Proposal - Contract. The Contractor shall diligently prosecute the work to completion as specified in the Proposal - Contract attached hereto.

1

6.    Insurance

(a) Neither the contractor nor any subcontractors shall commence any work until all required insurance has been obtained at their own expense. Such insurance must have the approval of the Owner as to limit, form, and amount.

(b) Contractor shall maintain liability insurance in an amount not less than $1,000,000 per person for bodily injury, $500,000 for property damage or a combined single limit of $1,000,000, and shall cover any subcontractors. Owner shall be named as an additional insured on such liability insurance policy.

(c) Contractor shall maintain during construction of the project all-risk property insurance on the project, including materials and equipment to be incorporated in the project and at the site, to its full insurable value, against fire, vandalism, and other perils ordinarily included in extended coverage.

(d) Contractor shall maintain worker compensation insurance to protect Contractor's employees during the progress of the work.

(e) Certificates of insurance evidencing all insurance coverage's required by this Agreement shall be provided to Owner within seven (7) days of execution of this agreement.

(f) The Contractor shall not permit any subcontractor to commence work on this project until such subcontractor has delivered to the owner certificates of insurance evidencing the insurance coverage's required by this paragraph 6.

(g) Any policy or policies of insurance that the Contractor elects to carry as insurance against loss or damage to his construction equipment and tools shall include a provision therein providing a waiver of the insurer's right to subrogation against the Owner.

(h) In Addition to any other remedy the Owner may have if the contractor or any of the subcontractors fail to maintain the insurance coverage as required in this Section, the Owner may obtain such insurance coverage as is not being maintained, in form and amount substantially the same as required herein, and the Owner may deduct the costs of such insurance from any amounts due or which may become due the Contractor under this Contract.

7.    Payments

Contractor shall provide owner with a complete list of all subcontractors, material men, and suppliers which will be providing labor, services, materials, or equipment under this Contract. No progress payment shall be made under this Contract unless and until contractor has provided owner with a conditional waiver and release from such subcontractors, suppliers, and material men substantially in the form set forth in California Civil Code section 3262, at which time Owner shall issue to Contractor and the applicable subcontractors. If at any time any claim or lien is asserted or filed against Owner or the project, then Owner shall have the right to retain out of any payment then due or to become due to Contractor an amount sufficient to discharge such liens or satisfy such claims and to pay all costs and expenses in connection therewith, including attorney's fees and costs. If amounts retained from payments to Contractor are insufficient to reimburse Owner, or a lien or claim remains undercharged or unsatisfied after all payments have been made to Contractor, the Contractor shall pay to Owner all moneys paid by Owner to discharge such lien or claim including attorneys costs and fees.

2

8. <u>Construction Staking and Surveys</u>

       The Owner will provide the Contractor with drawings showing the benchmarks and reference points as it deems necessary to establish lines and grades required for the completion of any site work specified in the Plans and Specifications. The Contractor shall make or furnish all surveys and set all construction stakes necessary for the completion of the work.

9. <u>Permits and Regulations</u>

    (a) Permits and licenses, of a temporary nature, necessary for the prosecution of the work shall be secured by Contractor and paid for by the Owner. Permits, licenses and assessments for permanent structures or permanent changes in existing facilities shall be paid for by the Owner unless otherwise specified.

    (b) The Contractor shall give all notices and comply with all laws, ordinances, rules and regulations bearing on the conduct of the work as shown on the Plans and Specification at variance therewith and any necessary changes shall be adjusted as provided in the Contract for changes in the work. If the Contractor performs any work which it knows or should have known to be contrary to such laws, ordinances, rules, and regulations, and without such notice to the Owner, Contractor shall bear all costs arising therefrom, including, but not limited to, bringing the work into compliance.

10. <u>Condition of Land</u>

    (a) Owner will furnish, as indicated in the plans and specifications, and not later than the date when needed by Contractor, the lands on which the work is to be done, rights-of-way for access thereto, and such other lands, which are designated for the use of Contractor. Owner will, on request, furnish to Contractor copies of any available boundary surveys and subsurface tests.

    (b) Unforeseen Subsurface Conditions: Contractor will promptly notify Owner in writing of any subsurface or latent physical conditions at the site differing materially from those indicated in the Contract Documents. Thereafter, Owner will promptly obtain necessary surveys or tests and furnish copies to Contractor. If the results of such surveys or tests indicate subsurface or latent physical conditions differing significantly from those indicated in the Contract Documents, a change order shall be issued incorporating any necessary revisions in the work. Adjustments in the contract price and time for completion shall be made, if required, in accordance with Section 12.

11. <u>Termination For Default - Damages For Daily - Timely Extension</u>

    (a) If the Contractor refuses of fails to prosecute the work, or any separable part thereof, with such diligence as will ensure the completion within the time specified in the Proposal - Contract, or any extension thereof, or fails to complete said work within such time, the Owner may, after giving five (5) days written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay.

    (b) The Contractor's right to proceed shall not be so terminated, nor the Contractor charged with resulting damage if:

        (1) The delay in the completion of the work arises from causes beyond the control and without the fault or negligence of the Contractor, including but not restricted to Acts of God, acts of a public enemy, acts of the Owner, acts of another contractor in the performance of a Contract with the Owner, fires, floods, epidemics, quarantine restrictions, strikes, lockouts, freight embargoes, unusually severe weather, or delays of subcontractors and suppliers arising from unforeseeable causes beyond the control and without the fault or negligence of either the Contractors or such subcontractors and suppliers.

3

(2) The Contractor, within five (5) days from the beginning of any such delay (unless the Owner grants further period of time before the date of final payment under the Contract), notifies the Owner in writing of the causes of delay and requests an extension of time.

(c) The Owner shall ascertain the facts and the extent of the delay and extend the time for completing the work when, in his reasonable judgment, the findings of fact justify such an extension, and his findings of fact shall be final and conclusive on the parties.

(d) A request for an extension of time, or the fronting of an extension of time, shall not constitute a basis for any claim against the Owner for additional compensation or damages unless caused solely by the Owner or another contractor employed by the Owner.

(e) If the Contractor should file for bankruptcy protection, or if he should make a general assignment for the benefit of his creditors, or if a receiver should be appointed for the benefit of his Contractors, on account of his insolvency and not be discharged within ten (10) days after his appointment, or if the Contractor should fail to make prompt payments to subcontractors or suppliers, or should be persistently disregard laws, ordinance, or the instructions of the Owner, or otherwise commit a substantial violation of any provisions of the Contract, the Owner may, after giving five (5) days written notice to the Contractor, terminate the Contractor and the Contractor's right to proceed with the work.

(f) The rights and remedies of the Owner provided in this paragraph are in addition to any of the rights and remedies provided by law or under this Contract.

(g) In addition to the Owner's rights under this paragraph, if at any time before completion of the work under the Contract, it shall be determined by the Owner that reasons beyond the control of the parties hereto render it impossible or against the interests of the Owner to complete the work, or if the work shall be stopped by an injunction of a court of competent jurisdiction or by order of any competent authority, the Owner may, upon five (5) days written notice to the Contractor, discontinue the work and terminate the Contract. Upon service of such notice of termination, the Contractor shall discontinue the work in such a manner, sequence, and at such times as the Owner may direct. The Contractor shall have no claim for damages (including, but not limited to, incidental or consequential damages) for such discontinuance or termination, nor any claim for anticipated profits on the work thus dispensed with, nor any other claim except for the work actually performed up to the time of discontinuance, including any extra work ordered by the Owner to be done.

12.  Work Changes

Owner reserves the right to order work changes in the nature of additions, deletions, or modifications, without invalidating the Contract. All changes must be authorized by a written change in the Contract price and/or the time for completion he shall nevertheless proceed with the ordered work and notify the Owner within ten (10) days of receipt of the change order of the nature and extent of the disagreement. Contractor and Owner shall negotiate in good faith to resolve any such dispute, and if not resolved the dispute shall be settled by arbitration pursuant to paragraph 27.

4

13. <u>Compliance with Laws - Permits, Regulations, Taxes</u>

Contractor is an independent contractor and shall at his sole cost and expense comply with all laws, rules, ordinances and regulations of all governing bodies having jurisdiction over the work, obtain all necessary permits and licenses therefor (other than those which are the responsibility of Owner pursuant to paragraph 9 (a), pay all manufacturer's taxes, sale taxes, use taxes, processing taxes, and all federal and state taxes, insurance and contributions for social security and unemployment which are measured by wages, salaries or any remuneration paid to Contractor's employees, whether levied under existing or subsequently enacted laws, rules or regulations. Contractors shall protect, identify and defend the Owner and all of the Owner's officers, agents, directors, partners, shareholders, affiliates and employees against any claim or liability arising from or based upon the violation of any such law, rule, ordinance, regulation, order or decree, whether by the Contractor itself or by its employee or subcontractors. The Contractor warrants to the Owner that he is licensed by all applicable governmental bodies to perform this Contract and will remain so licensed throughout the progress of the work, and that he has, and will have, throughout the progress of the work, the necessary experience, skill and financial resources to enable him to perform this Contract.

14. <u>Safety</u>

(a) The Contractor shall be solely and completely responsible for the condition of the job site related to his performance of the work under this Contract, including safety of all persons and property, during performance of the work. This requirement shall apply continuously and not be limited to normal working hours. Safety provisions shall conform to all applicable Federal, State, and local laws, ordinances, and codes, and to the rules and regulations established by the California's Division of Industrial Safety and to other rules of law applicable to the work.

(b) Owner's review of the Contractor's performance is not intended to include review of the adequacy of the Contractor's work methods, equipment, bracing or scaffolding or safety measures, in, on, or near the construction site, and shall not be construed as supervision of the actual construction nor make the Owner responsible for providing a safe place for the performance of work by the Contractor, subcontractors, or suppliers; or for access, visits, use work, travel or occupancy by any person.

15. <u>Contractor's Guarantee</u>

(a) In addition to warranties, representations and guarantees stated elsewhere in the contract documents, the Contract unconditionally guarantees and warrants that all materials and workmanship furnished hereunder shall be without defect and shall conform, to the Plans and Specifications, and agrees to replace at its sole cost and expense, and to the satisfaction of the Owner, any and all materials which may be defective, improperly installed, or which do not conform to the plans and specifications. All wiring shall conform to N.E.C. and Kern County codes. All construction shall conform to C.C.R. Title 8 Division 1 Chapter 4 Subchapter 7.

(b) The Contractor shall repair or replace to the satisfaction of the Owner any or all such work that may prove defective in workmanship or materials, which is improperly installed, or which does not conform to the to the plans and specifications, ordinary wear and tear excepted, together with any other work which may be damaged or displaced in so doing.

(c) In the event of failure to comply with the above stated conditions within a reasonable time, the Owner is authorized to have the defect repaired or replaced at the expense of the Contractor who will pay the costs and charges therefore immediately upon demand, including any reasonable management and administrative costs, and engineering, legal and other consulting fees incurred to enforce this section.

(d) Except as otherwise provided in this Contract, the guarantees and warranties shall remain in effect for one year after the completion of the project.

16. <u>Protection of Work</u>

5

(a) The Contractor shall use extreme care during construction to prevent damage from dust to crops and adjacent property caused by Contractor. The Contractor, at his own expense, shall provide adequate dust control for the right-of-way and take other preventative measures as directed by the Owner.

(b) The Contractor shall be responsible for all damage to any property resulting from trespass by the Contractor or his employees in the course of their employment, whether such trespass was committed with or without the consent or knowledge of the Contractor.

17.   Accidents

(a) The contractor shall provide and maintain, in accordance with Labor Code Section 6708 and OSHA requirements for his employees and anyone else who may be injured in connection with the work.

(b) The Contractor shall promptly report in writing to the Owner all accidents whatsoever arising out of, or in connection with, the performance of the work, whether on or adjacent to the site, which caused death, personal injury, or property damage, giving full details and statements of witnesses. In addition, if death or serious injury or serious damage are caused, the accidents shall be reported immediately by telephone or messenger to the Owner.

(c) If any claim is made by anyone against the Contractor or any Subcontractor on account to any accident, the Contractor shall promptly report the facts in writing to the Owner, giving full details of the claim.

18.   Ongoing Inspection

All materials and work are subject to ongoing inspection and testing by the Owner or its representatives. These individuals shall at all times have access to the work whenever it is in preparation or progress, and the Contractor shall provide safe and convenient access for such inspection.

19.   Final Inspection

Upon notice from the Contractor that the project is complete, owner will make a final inspection with Contractor and will notify Contractor in writing of any particulars in which this inspection reveals that the work is defective or incomplete. Contractor shall immediately take such actions as are necessary to remedy such defects and complete the work. Thirty-five (35) days after Contractor has completed any such work, final payment shall be due. Under no circumstances shall Owner's inspection or final inspection of the work constitute a waiver of Owner's rights and Contractor's obligations under paragraph 16 of this Contractor ("Contractor's Guarantee").

20.   Clean-up

During the progress of the work, the Contractor shall maintain the site and related structures and equipment in a clean, orderly condition and free from unsightly accumulation of rubbish. Upon completion of work and before the request for final payment is submitted, the Contractor shall at his own cost and expense remove from the vicinity of the work all plants, buildings, rubbish, unused work materials, concrete forms, and temporary bridging and other like materials, belonging to him or used under his direction during the construction, and in the event of his failure to do so, the same may be removed by the Owner after five (5) days notice to the Contractor, such removal to be at the expense of the Contractor. Where the construction has crossed yards or driveways, they shall be restored by the Contractor to the complete satisfaction of the owner, at the Contractor's expense.

6

21.    <u>Title</u>

       Title to any materials supplied by Contractor will pass to owner upon delivery of such materials to the job site and acceptance of such materials by Owner.

22.    <u>Waiver of Interest</u>

       The Owner shall have no obligation to pay and the Contractor hereby waives the right to recover interest with regard to moneys which the Owner is required to withhold by reason of judgment, order, statute, or judicial process.

23.    <u>Assignment; Subcontracting</u>

       The Contractor shall not assign the Contract, as a whole or in part, without the written consent of the Owner, nor shall the Contractor assign any moneys due, or to become due to him hereafter, without the prior written consent of the Owner.

24.    <u>Ownership of Plans</u>

       If plans or specification have been furnished for this work by Owner or an architect, Owner shall retain all ownership rights to the plans and any rights to duplicate them.

25.    <u>Notice</u>

       Any and all notices or other matters required or permitted by this Agreement or by law to be served on, given to, or delivered to either party hereto, owner or contractor, by the other party to this Agreement, shall be in writing and shall be deemed duly served, given or delivered when personal service, when deposited in the United States mail, first-class postage paid, addressed to Owner or to the Contractor at the address set forth in the Proposal-Contract. Either party, Owner or Contractor, may change its address for the purpose of this paragraph by giving written notice of such change to the other party in the manner provided by this paragraph.

26.    <u>Failure to Complete the Work in the Time Agreed Upon Liquidated Damages</u>

(a) It is agreed by the contracting parties that time is of the essence as to each provision of this Contract. If Contractor fails to complete the work under this Contract before or upon the expiration of the time limit as set forth in the Proposal-Contract, or within any time extensions that may have been granted, the parties hereto, agree that actual and serious damage will be sustained by the Owner in the conduct of its business and that from the nature of the circumstances it would be impracticable and extremely difficult to determine the actual amount of damage by reason of such failure. It is, therefore, stipulated and agreed that the Contractor shall pay to the Owners as liquidated damages the amount or amounts per day set forth in the Proposal-Contract for each and every day's delay in completing the work in excess of the number of days specified. The parties expressly agree that this liquidation damage clause is reasonable under the circumstances existing at the time the Contract was made and the amounts are payable as damages and not as a penalty. The Owner shall have the right to deduct the amount of liquidated damages from any money due or to become due the contractor.

(b) In addition to the liquidated damages specified above which are intended to reimburse Owner for damages suffered in the conduct of its business, Owner shall have the right to charge to the Contractor and to deduct from the final or progress payments for the work the actual cost to the Owner of legal, engineering, inspection, superintendent, and other expenses, which are directly chargeable to the Contract and which accrue during the period of such delay, except that the cost of final inspection and preparation of the final estimate shall not be included in the charges. Should this Contract be terminated by Owner for breach of this Contract, Owner shall also have the right to charge the Contractor for the actual cost of completion of the project over and above the contract price.

27.   Arbitration

      All claims, disputes, and other matters in question between Owner and Contractor arising out of, or relating to the Contract Documents or the breach thereof (except for claims which have been waived by the making of acceptance of final payment) will be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association. This agreement to arbitrate will be specifically enforceable under the prevailing law of any court having jurisdiction.

28    Indemnity and Litigation Cost

      (a) The Contractor specifically obligates itself and hereby agrees to protect, hold free and harmless, defend and indemnify the Owner, and its consultants, and each of their officers, directors, partners, affiliates, employees and agents, from any and all liability, penalties, cost, losses, damages, expenses, causes of action, claims or judgments, including attorney's fees, which arise out of or are in any way connected with the Contractor's, or its subcontractors' or suppliers' act, omission, or performance of work under this contract. To the extent legally permissible, this indemnity and hold harmless agreement by the Contractor shall apply to any acts or omissions, whether active or passive, on the part of the Contractor or its agents, employees, representatives, resulting in liability irrespective of whether or not any acts or omissions of the parties to be indemnified here under may also have been a contributing factor to the liability. This obligation shall not be continued to negate, abridge or otherwise reduce any right of indemnification which the Contractor may have as to any other person.

      (b) In any and all claims against the Owner and its consultants, and each of their officers, employees and agents by any employee of the Contractor, any subcontractor, anyone directly or indirectly employed by any of them, or anyone for whose acts any of them may be liable, the indemnification obligation under this section shall not be limited in any way by limitations on the amount or type of damages, compensation or benefits payable by or for the Contractor or any Subcontractor under worker's compensation statutes, disability benefit statutes or other employee benefit statutes.

29.   Binding On Successors in Interest

      This agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto.

30.   Attorney's Fees

      If either party becomes involved in arbitration or litigation arising out of this Contract or the performance or enforcement of it, then the party prevailing in such arbitration or litigation shall be entitled to reasonable attorney's fees and expert witnesses' fees, in addition to other costs, expenses and disbursements.

31.   Contractor's License Notice

      CONTRACTORS ARE REQUIRED BY LAW TO BE LICENSED AND REGULATED BY THE CONSTRUCTORS' STATE LICENSE BOARD. ANY QUESTIONS CONCERNING A CONTRACTOR MAY BE RENDERED TO THE REGISTRAR, CONTRACTORS' STATE LICENSE BOARD, 3132 BRADSHAW ROAD, SACRAMENTO, CALIFORNIA. MAILING ADDRESS: P.O. BOX 26000, SACRAMENTO, CALIFORNIA 95826.

32. <u>Miscellaneous</u>

(a) The waiver by either party of any default of the terms of this Contract shall not be deemed a waiver of any subsequent default. The remedies and rights of the parties in the event of any default, are cumulative and in addition to those given by law, and the expression herein of any specified right or remedy shall not be construed a limiting the parties from exercising any other right or remedy they may have.

(b) This contract supersedes all prior negotiations, proposals and understandings, of any of the parties hereto, and constitutes the entire understanding of the parties with reference to the work to be performed under this contract. This Contract shall not be modified except by a writing signed by all of the parties, or pursuant to Section 13.

(c) Any term or provision hereof that may be held invalid, void, or unenforceable for any reason by a court of competent jurisdiction shall be ineffective only to the extent of such invalidity or unenforceability, and the balance hereof shall remain in full force and effect.

# Exhibit B

# PROPOSAL CONTRACT

<u>Contract Number</u>: 10348                     <u>CAR#</u>: 1710.9000.10348

<u>Project</u>: *Almond Pasteurization Equipment*

<u>Owner</u>: **Paramount Farms**

<u>Contractor</u>: *Ventilex USA Inc..*

<u>Sub-Contractor</u>:

This contract is entered into this *9 day of November 2005*, by and between Owner and Contractor, with reference to the following terms:

1.  <u>The "Contract Terms"</u>

The following documents which are attached hereto and made a part hereof, taken together, constitute the contract ("Contract") between Owner and Contractor:

(a) This Proposal Contract.
(b) The Standard Conditions.
(c) Rules and Regulations (Excluding item E-3).
(d) The Plans and Specifications from: (*Ventilex USA Inc Proposal #8375H - 11 TPH* )
(e) Paramount Farms Bid # (*Ventilex USA Inc. Proposal #P-8375H-11 TPH* ).
(f) Any change orders issued or to be issued.
(g) Mechanical Standards & Equipment Memo
(h) All Equipment to be Stainless Steel.
(i) All equipment to be shipped FOB Lost Hills, CA.

2.  <u>Price</u>

The total price for the work to be done under this contract including tax is:

| Location | Description | Cost |
|---|---|---|
| Almonds | Pasteurizer | $199,875.00 |
| Almonds | Control Panel 30" X 55' | $ 46,125.00 |
| Almonds | Fluid Bed Dryer/Cooler | $338,250.00 |
| Almonds | Inlet Rotary Valve | $ 9,225.00 |
| Almonds | C.S. Cyclones | $ 61,500.00 |
| Almonds | Cooling Coil | $ 16,912.50 |
| Almonds | Inlet Additional Chute | $ 3,843.75 |
| Almonds | Microwave Moisture | $ 30,750.00 |
| Almonds | Installation | $ 59,000.00 |

Ventilex Pasteurizer Equipment - Proposal Contract _ (2).doc

11/10/2005  10:44   513-870-5173          VENTILEX USA          PAGE  02/03

Contract Number: 10348                    CAR#: 1710.9000.10348

Quote # P-8375B-11 TPH          Total Cost    $765,481.25

$0,000,000.00) plus shipping at cost.

3. Payment terms

    a. Paramount must receive invoice to pay. Payment to be within 30 days from receipt of original invoice only. This includes down payment.

    b. All invoices must include the PO number or payment may be delayed.

    c. The invoices must reflect exact contract coverage or delayed payment may result. The contract must be altered to agree with extras and a change order must be written to cover the exceptions.

    d. 30% down payment upon receipt of invoice subsequent to signing of this contract.

    e. 30% on December 1, 2005 with receipt of invoice.

    f. 30% or January 27, 2006 or upon Shipment if earlier with receipt of invoice.

    g. 10% balance to be paid after completion of all work and the equipment is running (processing product). Operating condition of the equipment must be acceptance by Paramount Farms (Not to exceed 45 days).

4. Progress Schedule and Completion Date

The work shall commence within seven days from the execution of this Contract. The work shall be completed cleaned and shipped on or before the *Ship Date of January 27, 2006.*

NOTE: Any delay due to Paramount Farms will result in an extension of the same number days.

5. Liquidated damages

Reference is made to Section 26 of the Standard Conditions. If the work under this Contract is not completed by the deadline set forth in Paragraph 4 of this Proposal-Contract (or as it may be extended pursuant to the terms of this Contract), the parties agree that liquidated damages shall be assessed and paid in the following amounts:

Ventilex Pasteurizer Equipment - Proposal Contract_ (2).doc

Contract Number: 10348                          CAR#:  1710.9000.10348

$ 1,000 per day       <u>(for 1<sup>st</sup> 5 days beyond completion ship date).</u>
$ 2,000 per day       <u>(for days 6-10 beyond completion ship date).</u>
$ 5,000 per day       <u>(for all days greater than 10 beyond listed completion
date).</u>

6.    <u>Plans and Specifications</u>

The work to be carried out by Contractor under this Contract is described in the plans and specifications attached hereto and made a part of this Contract.

7.    <u>Warranty</u>

The Contractor warrants that all the equipment covered by this quotation will be free of defects due to workmanship and materials for a period of <u>12 months</u> from start up. Which is estimated to be: *(1, March, 2006).*

8.    <u>Notices</u>

Attention is directed to Section 25 of the Standard Conditions.  Notice shall be given as follows:

To Owner:                          Paramount Farms, Inc.
                                   13646 Highway 33
                                   Lost Hills, CA 93249
                                   Attn.: Shawn Tremaine

To Contractor:                     Ventilex USA Inc.
                                   8106 Beckett Center Drive
                                   West Chester, Ohio 45069
                                   Attn:  Tom Schroeder

VENTILEX USA, INC.                 PARAMOUNT FARMS, INC.

By:                                By:

Date:  9 NOV 2005                  Date:  11/10/05

Thomas J. Schroeder

Ventilex Pasteurizer Equipment - Proposal Contract_ (2).doc

# Exhibit B-1

## VENTILEX PASTEURIZATION SYSTEM

8 November 2005

Paramount Farms                                    P: 661.797.6500
13646 Highway 33.                                  F: 661.797.6542
Lost Hills, CA 93249                               E: stremaine@paramountfarms.com

Attention:     Mr. Shawn Tremaine, Plant Engineer

Subject:       VENTILEX Pasteurization System

Re:            11 tph Deluxe Almond Pasteurizer System

Dear Mr. Tremaine:

In accordance with your telephone conversation with Peter Boettcher, VENTILEX USA Inc. proposes the following equipment:

1. One 11 TPH DELUXE VENTILEX Nut Pasteurization System as described on the following quotation No .P8378 – H- 11TPH
2. Installation of all VENTILEX supplied equipment at your facility is additional.
3. Freight delivered to your facility is additional. 3 containers at a cost of approximately $7,000 each, door to door is the freight estimate (might be slightly less)

Paramount Farms must supply:

a. Steam Boiler to supply correct amount of steam and pressure for the VENTILEX Pasteurization System (5,400 #/hr @ 87 PSI) and chilled water if necessary
b. Compressed Air – 10 cfh @ 90 PSI
c. 480 V, 3ph, 60 hz power
d. In-feed and discharge conveyors
e. Building for the equipment installation

VENTILEX USA Inc. and VENTILEX B.V. hereby certifies that the equipment that we supply will be accepted by the FDA and USDA for the Pasteurization of Almonds. The installation will be repeatable, verifiable, and that data logging will take place, thus allowing for trace ability and long term storage of data.

In addition, VENTILEX will work hand in hand with Paramount Farms to make sure that the "system" is accepted and "validated". VENTILEX guarantees the VENTILEX equipment will be validated and will correct any item found to be deficient at our cost.

VENTILEX appreciates your confidence in our company and our equipment, and we will work hard to meet your expectations.

Sincerely



Tom Schroeder
President

# Exhibit B-2

## VENTILEX PASTEURIZATION SYSTEM

Product specification
Name of the product                                 Almonds
Bulk density                                        37½ lbs/ft³              (600 kg/m³)
Average size                                        --

Capacity and design specifications
Product capacity                                    11 short ton/h          (10 metric T/h)
Water condensation                                  ± 880 #/h               (± 400 kg/h)
Initial moisture content                            as received
Outlet moisture content after steaming              9 - 10 %
Final moisture content after drying/cooling         5.5 - 6 %

Steamer area                                        33 ft²                  (3,0 m²)
Amount of steam                                     2,750 #/h               (1.250 kg/h)
Steam temperature                                   302 °F                  (150 °C)
Steam pressure (in under case)                      14½ PSI(a)              1 bar(a)
Residence time                                      10-30 sec

Dyer/cooler area                                    77 ft²                  7,15 m²
Dying area                                          31 ft²                  2,9 m²
Amount of drying air                                10.000 SCFM             20.000 kg/h
Drying air temperature                              195-230 °F              90°-110 °C
Cooling area                                        46 ft²                  4,25 m²
Amount of cooling air                               15.000 SCFM             30.000 kg/h
Cooling air temperature                             68 °F                   20 °C

Operation
The installation is designed for continuous operation. To achieve maximum capacity it is
necessary to have a continuous and determined (constant) product inlet flow.

Operation supply
Electrical                                          3 x 460 V/60 Hz
Compressed air                                      90 psi(g) free of oil and water (6 bar(g))
Heating medium                                      Steam 87 PSI(a)

Electrical usage (without options)                  used 115 HP, installed 153 HP

### Pos. 1 Shaking fluidbed steamer 33 ft² (3 m²)
Fluidbed steamer with shaking mechanism, undercase and distribution plate and uppercase. Manufactured in stainless steel AISI 304. Frame in mild steel profiles sandblasted and epoxy coated. Surface bedplate 33 ft², ±10 x 3,3 ft (3,0 m², 3x1 m) . Installed electric power shaking mechanism 4 HP. Undercase and upperhood (dryer part) insulated with mineral wool , covered with aluminium cladding. Tracing on uppercase.

### Pos. 2  Air supply system steamer
Steam supply system consisting of:
- Electro pneumatic steam control valve, housing in cast iron, internals in stainless steel.
- Stainless steel flexible between valve and undercase.

### Pos. 3  Shaking fluidbed dryer/cooler, 77 ft² (7,15 m²)
Fluidbed dryer/cooler with shaking mechanism, undercase and distribution plate and uppercase. Manufactured in stainless steel AISI 304. Frame in mild steel profiles sandblasted and epoxy coated. Surface bedplate 77ft², 18x4.3ft (7,15 m², 5,5x1,3m). Installed electric power shaking mechanism 7,5 HP. Undercase insulated with mineral wool , covered with aluminium cladding.

### Pos. 4  Air supply system
Air supply system consisting of:
- Supply fan dryer 10,000 SCFM (20.000 kg/h), direct driven centrifugal fan manufactured in steel plate, epoxy painted. Installed electric power 50 HP
- Hand operated throttle shutter on the pressure side of the fan
- Supply fan cooler 15,000 SCFM (30.000 kg/h), direct driven centrifugal fan manufactured in steel plate, epoxy painted. Installed electric power 50 HP
- In the cooling air section, an indirect heat exchanger suitable for chilled or cooled water. Heat exchanger manufactured in Cu/Al. Thermal capacity 2.050.000 BTU/h (600 kW)
- Hand operated throttle shutter on the pressure side of the fan
- Inlet filter (pre-filter and HEPA filter) on the suction side of the dryer fan.
- Inlet filter (pre filter and HEPA filter) on the suction side of the cooler fan.
- Indirect steam heated heat exchanger for heating 10,000 SCFM from ambient to 190–230°F (90-110°C). Thermal capacity 2.050.000 BTU/h (600 kW). Heat exchanger manufactured in Cu/Al.
- Connecting ductwork between above components, manufactured in mild steel plate 2 mm, epoxy coated.

## Pos. 5 Exhaust air system
- Exhaust fan, direct driven centrifugal fan. Capacity 30,000 ACFM (50.000 Am$^3$/h). Installed electric power 40 HP. Manufactured in steel hot dip galvanised.
- Throttle valve on the pressure side of the fan.
- Cyclone Separator with Rotary Valve for de-dusting the exhaust air
- Connecting ductwork, consisting of:
    - Ductwork between suction hood, cyclone and fan.
    - Further ducting by others.

Ductwork manufactured in stainless steel.

## Pos. 6 Project engineering and documentation
Engineering of the installation, delivery of foundation plans, layout drawing description of control sequences and as built books (max. 3 copies) in English language.

Instruction and maintenance books with information on all used components (as-built documentation) in the English language.

## Pos. 7 Electrical and instrumentation
Installation is supplied with control panel (PLC based), instrumentation and steam fittings. Cabling between control panel and field components is excluded unless installation is chosen.

Control system consisting of:
- PLC system Allen Bradley series
- Program software for PLC-operation
- Visualisation on the MCC (EXOR graphic display)
- Data logging with data storage.

All relevant signal, controls, alarms, indication are monitored.

## Pos. 8 Boiler
Supplied by Paramount Farms, 5,400 pounds per hour of steam at a pressure of 87 PIS minimum.

## Pos. 9 Start-up and Commissioning
Start-up and Commissioning services are provided for each installation not to exceed two (2) days. Additional field service can be contracted per the attached "Standard Rate for Field Service." Out of pocket travel and living expenses are Paramount Farms costs.

Quotation | 8 November 2005                          Almond Pasteurization System
P-8375H-11 TPH                                                        Page 4/4

## Pos. 10 Installation

VENTILEX can install or assist in the installation of the VENTILEX supplied equipment at
Paramount Farms. Paramount Farms must bring utilities (steam, electric, and compressed
air) to the site of the VENTILEX installation if VENTILEX does the installation.

## Pricing

|  |  |
|---|---|
| Pasteurizer Only | $ 199,875.00 |
| Control Panel Only | $ 46,125.00 |
| Fluid Bed Dryer/Cooler | $ 338,250.00 |
| Inlet Rotary Valve | $ 9,225.00 |
| C.S. Cyclones | $ 61,500.00 |
| Cooling Coil | $ 16,912.50 |
| Inlet Additional Chute | $ 3,843.75 |
| Microwave Moisture | $ 30,750.00 |
|  |  |
| Totals | $ 706,481.25 |

| | |
|---|---|
| Validity: | 11 Nov 2005 |
| F.O.B.: | VENTILEX B.V., Heerde, The Netherlands |
| Terms of Payment: | 30% with PO, 30% 60 days after PO, 30% when ready to ship, 10% after startup and Validation, not to exceed 90 days after receipt of equipment |
| Terms and Conditions: | See Attached "Terms and Conditions" Exhibit A Attached and made part of this proposal |
| Shipment: | By end of January 2006 based on order by 11 November 2005 |

VENTILEX appreciates your interest and will work diligently with Paramount Farms on this
project. We appreciate your trust. We will not let you down.

Sincerely,

Tom Schroeder
Ventilex USA

VENTILEX | 8106 Beckett Center Drive, West Chester, Ohio 45069-0717 | P: (513) 874-4451 | F: (513) 870-5173

VENTILEX USA Inc 11 TPH Almond Pasteurization System
P-8375-I Addendum 2

8 November 2005

Paramount Farms                          P: 661.797.6500
13646 Highway 33.                        F: 661.797.6542
Lost Hills, CA 93249                     E: stremaine@paramountfarms.com

Attention:    Mr. Shawn Tremaine, Plant Engineer

Subject:      VENTILEX Pasteurization System

Re:           11 tph Deluxe Almond Pasteurizer System

Dear Mr. Tremaine:

In accordance with our telephone conversations VENTILEX USA Inc. is pleased to
supply the following additional information relating to the purchase of an 11 TPH Almond
Pasteurization System:

### Freight Charges

Freight charges to deliver the System FOB Lost Hills, CA.............................$19,350
(This is a door to door delivery of the containers.) This is an estimate and may change
depending on fuel surcharges (quote obtained in August 2005)

### Installation

Our proposal from August 11th states that the installation of the equipment would be by
others or at an additional charge to Paramount Farms.

Based on Paramount Farms taking responsibility for the supply of the building, concrete,
air ducting and all utilities (air, electrical, steam and water) and bringing the utilities to the
equipment, installation charges to install and wire in the VENTILEX USA Inc. supplied
equipment, ductwork and control system would be:...........................................$59,000

### Installation Time Requirements

We would estimate that the mechanical installation would take approximately one week
to complete as the equipment is designed and built in a modular fashion and the
electrical installation would take approximately two weeks to complete. These parts of
the installation process would run concurrently with one another.

### Start Up and Commissioning

We have included two days of start up and commissioning service in our proposal.
For a system of this size we would anticipate one week as being typical for starting up
and commissioning. The additional days would fall under the rate schedule supplied in

VENTILEX USA Inc 11 TPH Almond Pasteurization System
P-8375-I Addendum 2

the proposal. All out of pocket travel and living expenses are at the Purchasers expense.

**Sanitation/Cleaning:** As discussed, we are changing the distribution plate on the California Nut machine very shortly. This plate is polished to dairy finish, then drilled (you saw the holes and type of holes), and then electro polished to de-burr the holes. This plate will be a mirror finish. We do not expect ANY issue on oil/dust sticking. In addition, all new units will have a clam-shell design, using pneumatic cylinders. The top will be opened for inspection. And third, we can install CIP rotating nozzles - high impingement style, random orbit (See Spraying Systems website for details on this if you like). Flow rate to each nozzle is approximately 18 gpm at 90 PSI. Requires a pump, and proper chemicals, etc - standard for CIP systems. There are 4 optional nozzles for the Pasteurizer. The Dryer/Cooler does not require this type of cleaning.

**Silver Bullet:** If there is a "Silver Bullet" technology that is commercially available for the throughput of 20,000 pounds/hr, providing 5 log reduction, TERP approved within 1 year that cost at least 50% less, and Paramount Farms purchases this equipment (documentation must be provided) VENTILEX will buy the equipment back at the sold to you price. If you elect to keep the equipment even after the "Silver Bullet" unit is out, we will assist you in turning the Pasteurizer into a Plasticizer (Changing the time in the unit is all that is necessary) and changing the Dryer/Cooler into a Roaster (Install more heat/burner to achieve higher temperature). The Dryer/Cooler is already designed for temperatures to 1000 F

Thanks very much for your consideration. We will do our best for Paramount Farms and are excited about working together on this project!

Sincerely,


Tom Schroeder
President
VENTILEX USA Inc.


Peter Boettcher
Sales Engineer
VENTILEX USA Inc.

VENTILEX USA Inc. – GENERAL TERMS AND CONDITIONS OF SALE - Revised January 2005 – Page 1

# GENERAL CONDITIONS
## for the
## SUPPLY OF MECHANICAL, ELECTRICAL AND ELECTRONIC PRODUCTS

### Brussels, August 2000

## PREAMBLE

1. These General Conditions shall apply when the parties agree in writing or otherwise thereto. When the General Conditions apply to a specific contract, modifications of or deviations from them must be agreed in writing.

The object(s) to be supplied under these General Conditions is (are) hereinafter referred to as the Product.

Wherever these General Conditions use the term in writing, this shall mean by document signed by the parties, or by letter, fax, electronic mail and by such other means as are agreed by the parties.

## PRODUCT INFORMATION

2. All information and data contained in general product documentation and price lists, whether in electronic or any other form, are binding only to the extent that they are by reference expressly included in the contract.

## DRAWINGS AND DESCRIPTIONS

3. All drawings and technical documents relating to the Product or its manufacture submitted by one party to the other, prior or subsequent to the formation of the contract, shall remain the property of the submitting party.

Drawings, technical documents or other technical information received by one party shall not, without the consent of the other party, be used for any other purpose than that for which they were provided. They may not, without the consent of the submitting party, otherwise be used or copied, reproduced, transmitted or communicated to a third party.

4. The Supplier shall, not later than at the date of delivery, provide free of charge information and drawings which are necessary to permit the Purchaser to erect, commission, operate and maintain the Product. Such information and drawings shall be supplied in the number of copies agreed upon or at least one copy of each. The Supplier shall not be obliged to provide manufacturing drawings for the Product or for spare parts.

## ACCEPTANCE TESTS

5. Acceptance tests provided for in the contract shall, unless otherwise agreed, be carried out at the place of manufacture during normal working hours.

If the contract does not specify the technical requirements, the tests shall be carried out in accordance with general practice in the appropriate branch of industry concerned in the country of manufacture

6. The Supplier shall notify the Purchaser in writing of the acceptance tests in sufficient time to permit the Purchaser to be represented at the tests. If the Purchaser is not represented, the test report shall be sent to the Purchaser and shall be accepted as accurate.

7. If the acceptance tests show the Product not to be in accordance with the contract, the Supplier shall without delay remedy any deficiencies in order to ensure that the Product complies with the contract. New tests shall then be carried out at the Purchaser's request, unless the deficiency was insignificant.

8. The Supplier shall bear all costs for acceptance tests carried out at the place of manufacture. The Purchaser shall however bear all traveling and living expenses for his representatives in connection with such tests.

## DELIVERY. PASSING OF RISK

9. Any agreed trade term shall be construed in accordance with the INCOTERMS in force at the formation of the contract.

If no trade term is specifically agreed, the delivery shall be Ex works (EXW).

If, in the case of delivery Ex works, the Supplier, at the request of the Purchaser, undertakes to send the Product to its destination, the risk will pass not later than when the Product is handed over to the first carrier.

Partial shipments shall be permitted unless otherwise agreed.

## TIME FOR DELIVERY. DELAY

10. If the parties, instead of specifying the date for delivery, have specified a period of time on the expiry of which delivery shall take place, such period shall start to run as soon as the contract is entered into, all official formalities have been completed, payments due at the formation of the contract have been made, any agreed securities have been given and any other preconditions have been fulfilled.

11. If the Supplier anticipates that he will not be able to deliver the Product at the time for delivery, he shall forthwith notify the Purchaser thereof in writing, stating the reason, and, if possible, the time when delivery can be expected.

VENTILEX USA Inc. – GENERAL TERMS AND CONDITIONS OF SALE - Revised January 2004 – Page 2

If the Supplier fails to give such notice, the Purchaser shall be entitled to compensation for any additional costs , which he incurs and which he could have avoided had he received such notice.

12. If delay in delivery is caused by any of the circumstances mentioned in Clause 39 or by an act or omission on the part of the Purchaser, including suspension under Clauses 20 or 42, the time for delivery shall be extended by a period which is reasonable having regard to all the circumstances in the case. This provision applies regardless of whether the reason for the delay occurs before or after the agreed time for delivery.

13. If the Product is not delivered at the time for delivery (as defined in Clauses 10 and 12), the Purchaser is entitled to liquidated damages from the date on which delivery should have taken place.

The liquidated damages shall be payable at a rate of 0.5 per cent of the purchase price for each completed week of delay. The liquidated damages shall not exceed 7.5 per cent of the purchase price.

If only part of the Product is delayed, the liquidated damages shall be calculated on that part of the purchase price which is attributable to such part of the Product as cannot in consequence of the delay be used as intended by the parties.

The liquidated damages become due at the Purchaser's demand in writing but not before delivery has been completed or the contract is terminated under Clause 14.

The Purchaser shall forfeit his right to liquidated damages if he has not lodged a claim in writing for such damages within six months after the time when delivery should have taken place.

14. If the delay in delivery is such that the Purchaser is entitled to maximum liquidated damages under Clause 13 and if the Product is still not delivered, the Purchaser may in writing demand delivery within a final reasonable period which shall not be less than one week.

If the Supplier does not deliver within such final period and this is not due to any circumstance for which the Purchaser is responsible, then the Purchaser may by notice in writing to the Supplier terminate the contract in respect of such part of the Product as cannot in consequence of the Supplier's failure to deliver be used as intended by the parties.

If the Purchaser terminates the contract he shall be entitled to compensation for the loss he has suffered as a result of the Supplier's delay. The total compensation, including the liquidated damages which are payable under Clause 13, shall not exceed 15 per cent of that part of the purchase price which is attributable to the part of the Product in respect of which the contract is terminated.

The Purchaser shall also have the right to terminate the contract by notice in writing to the Supplier, if it is clear from the circumstances that there will occur a delay in delivery which, under Clause 13 would entitle the Purchaser to maximum liquidated damages.

In case of termination on this ground, the Purchaser shall be entitled to maximum liquidated damages and compensation under the third paragraph of this Clause 14.

15. Liquidated damages under Clause 13 and termination of the contract with limited compensation under Clause 14 are the only remedies available to the Purchaser in case of delay on the part of the Supplier. All other claims against the Supplier based on such delay shall be excluded, except where the Supplier has been guilty of gross negligence.

In these General Conditions gross negligence shall mean an act or omission implying either a failure to pay due regard to serious consequences, which a conscientious supplier would normally foresee as likely to ensue, or a deliberate disregard of the consequences of such act or omission.

16. If the Purchaser anticipates that he will be unable to accept delivery of the Product at the delivery time, he shall forthwith notify the Supplier in writing thereof, stating the reason and, if possible, the time when he will be able to accept delivery.

If the Purchaser fails to accept delivery at the delivery time, he shall nevertheless pay any part of the purchase price which becomes due on delivery, as if delivery had taken place. The Supplier shall arrange for storage of the Product at the risk and expense of the Purchaser. The Supplier shall also, if the Purchaser so requires, insure the Product at the Purchaser s expense.

17. Unless the Purchaser's failure to accept delivery is due to any such circumstance as mentioned in Clause 39, the Supplier may by notice in writing require the Purchaser to accept delivery within a final reasonable period.

If, for any reason for which the Supplier is not responsible, the Purchaser fails to accept delivery within such period, the Supplier may by notice in writing terminate the contract in whole or in part. The Supplier shall then be entitled to compensation for the loss he has suffered by reason of the Purchaser's default. The compensation shall not exceed that part of the purchase price, which is attributable to that part of the Product in respect of which the contract is terminated.

## PAYMENT

18. Unless otherwise agreed, the purchase price shall be paid with one third at the formation of the contract and one third when the Supplier notifies the Purchaser that the Product, or the essential part of it, is ready for delivery. Final payment shall be made when the Product is delivered.

Payments shall be made within 30 days of the date of the invoice.

19. Whatever the means of payment used, payment shall not be deemed to have been effected before the Supplier's account has been fully and irrevocably credited.

20. If the Purchaser fails to pay by the stipulated date, the Supplier shall be entitled to interest from the day on which payment was due. The rate of interest shall be as agreed between the parties. If the parties fail to agree on the rate of interest, it shall be 8 percentage points above the rate of the main refinancing facility of the European Central Bank in force on the due date of payment.

In case of late payment the Supplier may, after having notified the Purchaser in writing, suspend his performance of the contract until he receives payment.

If the Purchaser has not paid the amount due within three months the Supplier shall be entitled to terminate the contract by notice in writing to the Purchaser and to claim compensation for the loss he has incurred. The compensation shall not exceed the agreed purchase price.

## RETENTION OF TITLE

21.  The Product shall remain the property of the Supplier until paid for in full to the extent that such retention of title is valid under the applicable law.

The Purchaser shall at the request of the Supplier assist him in taking any measures necessary to protect the Supplier's title to the Product in the country concerned.

The retention of title shall not affect the passing of risk under Clause 9.

## LIABILITY FOR DEFECTS

22.  Pursuant to the provisions of Clauses 23-37 inclusive, the Supplier shall remedy any defect or nonconformity (hereinafter termed defect(s)) resulting from faulty, design, materials or workmanship.

23.  The Supplier's liability is limited to defects, which appear within a period of one year from delivery. If the daily use of the Product exceeds that which is agreed, this period shall be reduced proportionately.

24.  When a defect in a part of the Product has been remedied, the Supplier shall be liable for defects in the repaired or replaced part under the same terms and conditions as those applicable to the original Product for a period of one year. For the remaining parts of the Product the period mentioned in Clause 23 shall be extended only by a period equal to the period during which the Product has been out of operation as a result of the defect.

25.  The Purchaser shall without undue delay notify the Supplier in writing of any defect which appears. Such notice shall under no circumstance be given later than two weeks after the expiry of the period given in Clause 23.

The notice shall contain a description of the defect.

If the Purchaser fails to notify the Supplier in writing of a defect within the time limits set forth in the first 'paragraph of this Clause, he loses his right to have the defect remedied.

Where the defect is such that it may cause damage, the Purchaser shall immediately inform the Supplier in writing. The Purchaser shall bear the risk of damage resulting from his failure so to notify.

26.  On receipt of the notice under Clause 25 the Supplier shall remedy the defect without undue delay and at his own cost as stipulated in Clauses 22-37 inclusive.

Repair shall be carried out at the place where the Product is located unless the Supplier deems it appropriate that the defective part or the Product is returned to him for repair or replacement.

The Supplier is obliged to carry out dismantling and re-installation of the part if this requires special knowledge. If such special knowledge is not required, the Supplier has fulfilled his obligations in respect of the defect when he delivers to the Purchaser a duly repaired or replaced part.

27.  If the Purchaser has given such notice as mentioned in Clause 25 and no defect is found for which the Supplier is liable, the Supplier shall be entitled to compensation for the costs he has incurred as a result of the notice.

28.  The Purchaser shall at his own expense arrange for any dismantling and reassembly of equipment other than the Product, to the extent that this is necessary to remedy the defect.

29.  Unless otherwise agreed, necessary transport of the Product and/or parts thereof to and from the Supplier in connection with the remedying of defects for which the Supplier is liable shall be at the risk and expense of the Supplier. The Purchaser shall follow the Supplier's instructions regarding such transport.

30.  Unless otherwise agreed, the Purchaser shall bear any additional costs which the Supplier incurs for repair, dismantling, installation and transport as a result of the Product being located in a place other than the destination stated in the contract or -if no destination is stated -the place of delivery.

31.  Defective parts, which have been replaced, shall be made available to the Supplier and shall be his property.

32.  If, within a reasonable time, the Supplier does not fulfill his obligations under Clause 26, the Purchaser may by notice in writing fix a final time for completion of the Supplier's obligations.

If the Supplier fails to fulfill his obligations within such final time, the Purchaser may himself undertake or employ a third party to undertake necessary remedial works at the risk and expense of the Supplier.

Where successful remedial works have been undertaken by the Purchaser or a third party, reimbursement by the Supplier of reasonable costs incurred by the Purchaser shall be in full settlement of the Supplier's liabilities for the said defect.

33.  Where the defect has not been successfully remedied, as stipulated under Clause 32,

a) the Purchaser is entitled to a reduction of the purchase price in proportion to the reduced value of the Product, provided that under no circumstance shall such reduction exceed 15 per cent of the purchase price, or

b) where the defect is so substantial as to significantly deprive the Purchaser of the benefit of the contract, the Purchaser may terminate the contract by notice in writing to the Supplier. The Purchaser is then entitled to compensation for the loss he has suffered up to a maximum of 15 per cent of the purchase price.

34.  The Supplier is not liable for defects arising out of materials provided, or a design stipulated or specified by the Purchaser.

35.  The Supplier is liable only for defects which appear under the conditions of operation provided for in the contract and under proper use of the Product.

VENTILEX USA Inc. – GENERAL TERMS AND CONDITIONS OF SALE - Revised February 2002 – Page 4

The Supplier's liability does not cover defects which are caused by faulty maintenance, incorrect erection or faulty repair by the Purchaser, or by alterations carried out without the Supplier's consent in writing.

Finally the Supplier's liability does not cover normal wear and tear or deterioration.

36.  Notwithstanding the provisions of Clauses 22-3 5 the Supplier shall not be liable for defects in any part of the Product for more than two years from the beginning of the period given in Clause 23.

37.  Save as stipulated in Clauses 22-36, the Supplier shall not be liable for defects. This applies to any loss the defect may cause including loss of production, loss of profit and other indirect loss. This limitation of the Supplier's liability shall not apply if he has been guilty of gross negligence as defined in Clause 15.

## ALLOCATION OF LIABILITY FOR DAMAGE CAUSED BY THE PRODUCT

38.  The Supplier shall not be liable for any damage to property caused by the Product after it has been delivered and whilst it is in the possession of the Purchaser. Nor shall the Supplier be liable for any damage to products manufactured by the Purchaser, or to products of which the Purchaser's products form a part.

If the Supplier incurs liability towards any third party for such damage to property as described in the preceding paragraph, the Purchaser shall indemnify, defend and hold the Supplier harmless.

If a claim for damage as described in this Clause is lodged by a third party against one of the parties, the latter party shall forthwith inform the other party thereof in writing.

The Supplier and the Purchaser shall be mutually obliged to let themselves be summoned to the court or arbitral tribunal examining claims for damages lodged against one of them on the basis of damage allegedly caused by the Product.

The limitation of the Supplier's liability in the first paragraph of this Clause shall not apply where the Supplier has been guilty of gross negligence as defined in Clause 15.

## FORCE MAJEURE

39.  Either party shall be entitled to suspend performance of his obligations under the contract to the extent that such performance is impeded or made unreasonably onerous by any of the following circumstances: industrial disputes and any other circumstance beyond the control of the parties such as fire, war, extensive military mobilization, insurrection,

requisition, seizure, embargo, restrictions in the use of power and defects or delays in deliveries by sub-contractors caused by any such circumstance referred to in this Clause.

A circumstance referred to in this Clause whether occurring prior to or after the formation of the contract shall give a right to suspension only if its effect on the performance of the contract could not be foreseen at the time of the formation of the contract.

40.  The party claiming to be affected by Force Majeure shall notify the other party in writing without delay on the intervention and on the cessation of such circumstance.

If Force Majeure prevents the Purchaser from fulfilling his obligations, he shall compensate the Supplier for expenses incurred in securing and protecting the Product.

41.  Regardless of what might otherwise follow from these General Conditions, either party shall be entitled to terminate the contract by notice in writing to the other party if performance of the contract is suspended under Clause 39 for more than six months.

## ANTICIPATED NON-PERFORMANCE

42.  Notwithstanding other provisions in these General Conditions regarding suspension, each party shall be entitled to suspend the performance of his obligations under the contract, where it is clear from the circumstances that the other party will not be able to perform his obligations. A party suspending his performance of the contract shall forthwith notify the other party thereof in writing.

## CONSEQUENTIAL LOSSES

43.  Save as otherwise stated in these General Conditions there shall be no liability for either party towards the other party for loss of production, loss of profit, loss of use, loss of contracts or for any other consequential or indirect loss whatsoever.

## DISPUTES AND APPLICABLE LAW

44.  All disputes arising out of or in connection with the contract shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one or more arbitrators appointed in accordance with the said rules.

45.  The contract shall be governed by the substantive law of the Supplier's country.

VENTILEX USA, Inc.
8106 Beckett Center Dr.
West Chester, OH 45069
(513) 874-4451
Fax: (513) 870-5173
Email: sales@ventilex.net
Website: www.ventilex.net
Toll Free N. America: 866.265.6823

# Exhibit C

Case 1:08-cv-05859-DC Document 1-2 Filed 06/30/2008 Page 35 of 44



# American Arbitration Association

*Dispute Resolution Services Worldwide*

6795 North Palm Ave, 2nd Floor, Fresno, CA 93704
telephone: 877-528-0880 facsimile: 559-490-1919
http://www.adr.org

| | |
|---|---|
| DATE | 06/10/2008 1:34:20 PM |
| TO | Michael Martell |
| COMPANY | Morrison Cohen LLP |
| ADDRESS | 212-735-8708 |
| FROM | Jennifer R. Johnson |
| NUMBER OF PAGES | 9 (Including cover page) |
| | |
| RE | Case number: 72 110 Y 00581 08 |
| RECIPIENTS | Andrew Asch: Michael Martell |

NOTES:

THIS FAX TRANSMISSION IS INTENDED ONLY FOR THE USE OF THE PERSON TO WHOM IT IS ADDRESSED. IT MAY CONTAIN INFORMATION THAT IS CONFIDENTIAL, PRIVILEGED OR OTHERWISE EXEMPT FROM DISCLOSURE. IF YOU ARE NOT THE INTENDED RECIPIENT OR THE PERSON AUTHORIZED TO DELIVER THIS FAX TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION OF THIS FAX IS PROHIBITED. IF YOU HAVE RECEIVED THIS FAX IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE (COLLECT) AND RETURN THE ORIGINAL FAX TO US BY FIRST CLASS MAIL AT THE ABOVE ADDRESS.

 **American Arbitration Association**
*Dispute Resolution Services Worldwide*

*Western Case Management Center*
Jeffrey Garcia
Vice President
Cathe Stewart
Assistant Vice President

6795 North Palm Ave, 2nd Floor, Fresno, CA 93704
telephone: 877-528-0880 facsimile: 559-490-1919
internet: http://www.adr.org/

June 10, 2008

**VIA FACSIMILE ONLY**

Andrew Asch
Legal Department
Roll International Corporation
11444 West Olympic Blvd. 10th Floor
Los Angeles, CA 90064

Michael Martell
Morrison Cohen LLP
909 Third Avenue
New York, NY 10022-4731

Re: 72 110 Y 00581 08 JRJ
Paramount Farms, Inc.
VS
Ventilex, USA, Inc. and Ventilex B.V.

Dear Parties:

This will acknowledge receipt on June 05, 2008, of a Demand for Arbitration dated June 02, 2008, providing for administration of a controversy arising out of a contract between the above-captioned parties, containing a clause providing for administration by the American Arbitration Association (the Association). We understand that a copy was sent to Respondent. As the claim exceeds $500,000.00, the Large Complex Case Procedures will apply unless the parties agree otherwise. Please refer to our website, www.adr.org, for a copy of our Construction Industry Rules, the Guide to the Management of Large Complex Cases, and AAA WebFile which allows parties to perform a variety of case related activities online. I have also included the Arbitration Information Sheet, which provides you with some basic information about the AAA's arbitration process and set forth some initial dates by which certain steps should be completed by the parties.

Claimant has requested that the hearing be held in Los Angeles, California. Please review the Rules and the Arbitration Information Sheet regarding the locale of hearings. Also, in accordance with the Rules, if Respondent does not answer on or before June 25, 2008, we will assume that the claim is denied. If Respondent wishes to counterclaim, file two copies, together with the administrative fee, to my attention. A copy should also be directly sent to Claimant.

The parties' attention is directed to California Code of Civil Procedures Section 1282.4, regarding representation by an attorney not licensed to practice in the State of California. Please contact us if you need a certification form as described in the statute.

This will confirm an Administrative Conference is scheduled on June 18, 2008 at 11:00 a.m. PT via conference call. The Association will initiate this call. For your convenience, the enclosed Arbitration Information Sheet covers items to be discussed on the call.

Finally, in order to assist the AAA in providing you with arbitrators free from conflicts, I have enclosed a Checklist for Conflicts to list those witnesses you expect to present, as well as any persons or entities with an interest in these proceedings. The checklist should only be sent to the AAA and should not be exchanged between the parties. The Conflicts Checklist is due within fifteen days from the date of this letter.

For your convenience, attached is a fax cover sheet that we request be utilized when transmitting all written correspondence via facsimile to the Association in conjunction with the above captioned matter. Please note the fax number to be used is 212-484-4177, which is also located on the top of the fax cover sheet. By utilizing the fax cover sheet, your documents will be sent directly and securely to your case manager.

If you have questions regarding any of the information in this letter, please feel free to call me at your convenience. I look forward to assisting you in this matter.

Sincerely,

/s/

Wyndie Gibson for
Jennifer R. Johnson
LCC Case Manager
(559) 490-1879
Johnsonje@adr.org

*Supervisor Information: Lorena P. Garcia, 559 650 8058, GarciaL@adr.org*

Enclosures
Arbitration Information Sheet
Conflicts Checklist

## Arbitration Information Sheet

This document provides information about your upcoming arbitration and the expectations concerning each party's conduct throughout the process. Please save this information sheet so that you may refer to it throughout the arbitration.

### Administrative Conference

The AAA may conduct an Administrative Conference with the parties to discuss issues that will assist the Association in administering the case as efficiently as possible. This is also a good time for the parties to discuss ways to conduct the arbitration to meet their specific needs. Please be prepared to discuss the following:

    a.  estimates on the expected duration of the case;
    b.  number of arbitrators/party-appointed arbitrator provision;
    a.  method of appointment of arbitrators, if applicable;
    b.  your views on the qualifications of the arbitrators to be proposed;
    a.  the possibility of submitting this dispute to mediation;
    a.  the handling of extension requests;
    a.  means of communication between the AAA and the parties;
    f.  the possibility of utilizing a documents only process.

### Exchange of Correspondence and Documents

It is also important to note that the parties must exchange copies of all correspondence during the course of the arbitration. The two exceptions are the Checklist for Conflicts mentioned above and the party's arbitrator ranking list, which you will receive further information on during the course of the arbitrator appointment process. The parties only need to send copies of documents, such as discovery, to the AAA if the document is to be transmitted to the arbitrator for a determination.

### Communications with Arbitrator

It is very important that parties do not engage in any ex-parte communications with the arbitrator. So as to minimize the potential of such communications, this case will be administered by facilitating the exchange of appropriate written documents through the AAA. To ensure the proper handling of all case-related documents, the parties are asked not to submit correspondence directly to the arbitrator. Correspondence should be submitted to your case manager for transmittal to the arbitrator, copying the other party.

### Timeliness of Filings

Please pay particular attention to response dates included on any correspondence I send you. Untimely filings or responses will not be considered by the Association. Therefore, if you need an extension to any deadline, please contact the other party to reach an agreement. In the event you are unable to agree, the AAA or the arbitrator will determine if an extension will be granted.

### Locale of the Arbitration

The parties may agree to a locale for the arbitration. This agreement can be made in the parties' agreement or contract, or when the arbitration is submitted to the AAA. The AAA will place the arbitration within the agreed upon locale.

If the parties' contract or agreement does not specify a locale and the parties cannot agree on a locale, the AAA's Rules empower the AAA to determine the final locale. In these circumstances, the claimant will generally request that the hearing be held in a specific locale. If the respondent fails to file an objection to the locale requested by the claimant within 15 calendar days after the notice of the request, the AAA will confirm the locale requested by the claimant is agreeable.

When a locale objection is filed, each party is requested to submit written statements regarding its reasons for preferring a specific locale. In preparing their written statements, the parties are asked by the administrator to address the following issues:

1. Location of parties & attorneys.
2. Location of witness and documents.
3. Location of records.
4. If construction, location of site, place or materials and the necessity of an on-site inspection.
5. Consideration of relative difficulty in traveling and cost to the parties.
6. Place of performance of contract.
7. Place of previous court actions.
8. Location of most appropriate panel.
9. Any other reasonable arguments that might affect the locale determination.

## AAA WebFile

We invite the parties to visit our website to learn more about how to file and manage your cases online. As part of our administrative service, AAA's WebFile allows parties to perform a variety of case related activities, including:

- File additional claims
- Complete the Checklist for Conflicts form
- View invoices and submit payment
- Share and manage documents
- Strike and rank listed neutrals
- Review case status or hearing dates and times

AAA WebFile provides flexibility because it allows you to work online as your schedule permits – day or night. Cases originally filed in the traditional offline manner can also be viewed and managed online. If the case does not show up when you log in, you may request access to the case through WebFile. Your request will be processed within 24 hours, after review by your case manager.

## Refund Schedule

The Association has a refund schedule in the administrative fee section of the Rules. After 60 days of the Association's receipt of the Demand or the appointment of the arbitrator the filing fees are non-refundable. The Association will only refund filing fees as outlined in the Rules and does not refund neutral costs incurred when parties settle their dispute or withdraw their claims. Case service fees are fully refundable if the parties provide at least 24 hours notice prior to the hearing.

# AMERICAN ARBITRATION ASSOCIATION
## CHECKLIST FOR CONFLICTS

In the Matter of the Arbitration between:
Re: 72 110 Y 00581 08 JRJ
    Paramount Farms, Inc.
    VS
    Ventilex, USA, Inc. and Ventilex B.V.

CASE MANAGER: Jennifer R. Johnson
DATE: June 10, 2008

To avoid the possibility of a last-minute disclosure and/or disqualification of the arbitrator pursuant to the rules, we must advise the arbitrator of the full and complete names of all persons, firms, companies or other entities involved in this matter. Please list below the full names of all interested parties in this case, including, but not limited to, witnesses, consultants, and attorneys. In order to avoid conflicts of interest, parties are requested to also list subsidiary and other related entities. This form will only be used as a list for conflicts, not a preliminary or final witness list. Please note that the AAA will not divulge this information to the opposing party and the parties are not required to exchange this list. This form will, however, be submitted to the arbitrator, together with the filing papers. You should be aware that arbitrators will need to divulge any relevant information in order to make appropriate and necessary disclosures in accordance with the applicable arbitration rules.

For your convenience, this form may be completed online through AAA's WebFile.

FULL NAME                    AFFILIATION               ADDRESS

DATED: _____    PARTY: _____
                                          Please Print



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

## Fact Sheet

### Enhanced Neutral Selection Process
*for Large Complex Cases*

In addition to the standard procedure for selecting a neutral as outlined in the rules, the AAA offers parties the following options individually or in a combination:

- **Oral or written interviews of the arbitrator candidates**
  *The AAA case manager will work with parties to develop an interview protocol in order for the parties to have an opportunity to present questions to potential arbitrator candidates, either through a telephone conference, or in writing. Examples of interview question topics might include: industry expertise, relative experience in similar disputes, the arbitrator's procedural handling practices, and any other questions that the parties would find helpful to the selection process.*

- **Pre-screening for arbitrator disclosures and availability**
  *The AAA case manager will pre-screen a select number of arbitrators who possess the qualifications requested by the parties. The arbitrators may be pre-qualified for conflicts of interest, availability, or both.*

- **Additional Information**
  *The AAA case manager will obtain additional information about an arbitrator's experience in the field of the dispute, as requested by the parties. This may also include a request for references.*

- **Block listing**
  *For cases involving three-arbitrator panels, the AAA case manager can provide separate lists of arbitrators to the parties, each one containing arbitrators with a specified background or level of expertise, i.e., one list of retired judges, one list of attorneys and one list of business and industry experts.*

As with any aspect of a case filed with the AAA, the case manager is your contact person and has specific expertise in dealing with issues unique to Large Complex Cases. The parties' input in conjunction with the case manager's expertise will ensure that parties are given the best opportunity for finding the arbitrator that is qualified to resolve their dispute.

The Enhanced Neutral Selection Process is designed to give parties the tools they need to meet this goal. The process instills greater party confidence in the selected arbitrator, and can often save time and expense in the long run.

Parties can customize any or all of the above methods, in order to meet their needs during the arbitrator appointment process.

We understand that selecting the right arbitrator is critical to the parties' satisfaction with the arbitration process, which is why this service is offered at no additional charge.

We encourage the parties to work together to agree on as many procedural items as possible. As long as the process is fair and reasonable, and does not violate any applicable law or AAA rules, we are happy to facilitate an enhanced selection process that is developed and agreed upon by the parties.

*The purpose of this Fact Sheet is to provide a brief guide to the Enhanced Neutral Selection Process. Please make sure to review the applicable rules and guides for more information.*


**American Arbitration Association**
*Dispute Resolution Services Worldwide*

Fact Sheet

## Enhanced Neutral Selection Process
### *for Large Complex Cases*

### The American Arbitration Association's National Roster of Neutrals

- Highly trained, accomplished, and respected experts from the legal and business communities.
- Leaders in their fields with achieved academic and professional awards and honors.
- At least 15 years of senior level business experience or legal practice.
- Training and experience in arbitration or other forms of dispute resolution.
- Continuing education and training in the AAA rules, case management procedures, the arbitrator's role and authority, and legal and statutory developments affecting arbitration.
- Experience has shown that AAA's trained neutrals significantly impact the efficiency of the ADR process and the satisfaction of the parties.

### What is the Enhanced Neutral Selection Process?

The Enhanced Neutral Selection Process is a level of service that is designed to give parties in AAA arbitrations who use the Procedures for Large, Complex disputes greater flexibility and control in selecting the most appropriate arbitrator for their case. At no additional cost, parties can agree to customize their neutral selection process by agreeing to use one or more of the screening processes offered. Parties are encouraged to discuss options with each other and their case manager who will be knowledgeable in helping the parties fine tune their selection process.

The following is an overview of the suggested options offered using the Enhanced Neutral Selection Process:

- **Representative sample review**
  *The AAA case manager will provide the parties with an initial sample of arbitrator resumes based on the qualifications requested by the parties. The parties will review the sample resumes and confer with the case manager to give feedback on whether the arbitrators presented meet their needs. This feedback will be used in developing the final list of arbitrators from which the parties will select.*

- **Pre-screening for arbitrator disclosures and availability**
  *The AAA case manager will pre-screen a select number of arbitrators who possess the qualifications requested by the parties. The arbitrators may be pre-screened for conflicts of interest, availability, or both.*

*The purpose of this Fact Sheet is to provide a brief guide to the Enhanced Neutral Selection Process. Please make sure to review the applicable rules and guides for more information.*



**American Arbitration Association**
*Dispute Resolution Services Worldwide*

- **Supplemental Description of Arbitrator's Experience**
  *The parties can request more information in the form of a brief synopsis regarding specific expertise in a specific field. The arbitrators will be requested to elaborate on experience in a specific area as requested by the parties. This may also include a request for references and/or a copy of a CV, where applicable.*

- **Oral or written interviews of the arbitrator candidates**
  *The AAA case manager will work with parties to develop an interview protocol in order for the parties to have an opportunity to present questions to a select number of potential arbitrator candidates, either through a telephone conference, or in writing. Examples of interview question topics might include: industry expertise, relative experience in similar disputes, the arbitrator's procedural handling practices, and any other questions that the parties would find helpful to the selection process.*

- **Block listing**
  *For cases involving three-arbitrator panels, the AAA case manager can provide separate lists of arbitrators to the parties, each one containing arbitrators with a specified background or level of expertise, i.e., one list of retired judges, one list of attorneys and one list of business and industry experts.*

As with any aspect of a case filed with the AAA, the case manager is your contact person and has specific expertise in dealing with issues unique to Large Complex Cases. The parties' input in conjunction with the case manager's expertise will ensure that parties are given the best opportunity for finding the arbitrator that is qualified to resolve their dispute.

Parties know how important the selection of the right neutral is in having an effective arbitration process. The above services can give the parties confidence that they have met that goal. This service is offered at no additional cost and the case manager will help facilitate an agreement during an administrative conference.

We encourage the parties to work together to agree on as many procedures as possible and we will work to try to find a process that is agreeable to everyone. However, if after full discussion with the parties, an agreement is not reached, the AAA will administer the case in accordance with the standard arbitrator selection process outlined in the rules.

*The purpose of this Fact Sheet is to provide a brief guide to the Enhanced Neutral Selection Process. Please make sure to review the applicable rules and guides for more information.*

# American Arbitration Association

## Western Case Management Center
### Fax Number: 1-212-484-4177

---

### Facsimile Transmittal

---

Date: _____

# of Pages: ____

Case Number: 72-110-00581-08

Case Caption:

Paramount Farms, Inc.
and
Ventilex, USA, Inc. and Ventilex B.V.

Case Manager: Jennifer Johnson

# * 722008000581*

# * 722008000581*

*722008000581*